**Scott H. SOUTHWORTH and Benjamin Thompson, Plaintiffs–Appellees,**

**v.**

**BOARD OF REGENTS OF THE UNI-VERSITY OF WISCONSIN SYS-TEM, Defendant–Appellant.**

No. 01–1912.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 27, 2001.

Decided Oct. 1, 2002.

As Amended Oct. 2, 2002.

Jordan W. Lorence (argued), Alliance Defense Fund Law Center, Scottsdale, AZ, for Plaintiffs-Appellees.

Thomas J. Balistreri, Peter C. Anderson (argued), Office of the Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Defendant-Appellant.

Justin P. Smith, Public Citizen Litigation Group, Michael D. Leffel, Wilmer, Cutler & Pickering, Washington, DC, for Amicus Curiae.

Before BAUER, WOOD, Jr., and MANION, Circuit Judges.

MANION, Circuit Judge.

Six years ago, several students at the University of Wisconsin–Madison ("the University") sued the University challenging its mandatory student activity fee system on First Amendment grounds. Following appeals to this court and to the United States Supreme Court, on remand to the district court, the sole issue remaining was whether the mandatory fee system unconstitutionally granted the student government unbridled discretion for deciding which student organizations to fund. According to the students, such unbridled discretion existed and thus the system failed to guarantee that the funds would be distributed in a viewpoint-neutral manner as required by the First Amendment. The district court agreed with the students and held that the University of Wisconsin–Madison's mandatory student activity fee system violated the First Amendment. *Fry v. Board of Regents of the Univ. of Wis. Sys.*, 132 F.Supp.2d 744 (W.D.Wis. 2000). We reverse the district court's decision that the mandatory fee system unconstitutionally grants the student government unfettered discretion, except as to the funding of travel grants for which the student government has yet to adopt specific funding criteria.

## I.

This case dates back to 1996, and this is the fourth time it is before us. *Southworth v. Grebe*, No. 97–1001, 1997 WL 411225 (7th Cir. July 11, 1997) (unpublished order); *Southworth v. Grebe*, 151 F.3d 717 (7th Cir.1998), *rehearing denied*, *Southworth v. Grebe*, 157 F.3d 1124 (7th Cir.), *rev'd Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Southworth v. Board of Regents of University of Wisc. Sys.*, Nos. 97–3510, 97–3548, 2000 WL 831585 (7th Cir. June 23, 2000) (un-

published order). To the extent necessary, relevant facts are repeated. For additional details, the interested reader is referred to our prior opinions.

In April 1996, three University of Wisconsin–Madison students sued the University challenging a portion of the University's mandatory student activity fee system. The students claimed that forcing them to fund other students' political and ideological speech violated their First Amendment rights. While the mandatory student fees funded both "non-allocable" items (e.g., intramural sports, debt service, upkeep and operations of the student union facilities) and "allocable" programs, the plaintiffs challenged only the allocable portion of the mandatory fee system. These allocable fees were distributed to various Registered Student Organizations ("RSO") which used the money to engage in a variety of extracurricular activities, ranging from displaying posters and circulating newsletters, to hosting campus debates and guest speakers, to political lobbying.

At the time the plaintiffs filed suit, an RSO could obtain a portion of the allocable fees in one of three ways. The organization could seek funding from the Student Government Activity Fund ("SGAF"), which was administered by the Associated Students of Madison ("ASM") Finance Committee, or an RSO could apply for funding from the General Student Services Fund ("GSSF"), which was administered through the Student Services Finance Committee ("SSFC"). The third method of funding was through a student referendum.[1] For instance, during the 1995–1996 academic year, the Wisconsin Public Interest Research Group ("WISPIRG") obtained $45,000 in funding as the result of a student referendum. WISPIRG in turn used this money to support various political and ideological activities and speech, including contributing $2,500 directly to its parent organization, the U.S. Public Interest Research Group ("PIRG") for use in lobbying Congress.

Like WISPIRG, many RSOs used a portion of the student activity fees to engage in political and ideological activities. The plaintiffs, believing that this system unconstitutionally compelled them to fund speech they deemed objectionable, sued the University. The district court granted the plaintiffs summary judgment, concluding that the University's mandatory student activity fee program violated the First Amendment. The University appealed the district court's decision to this court. Applying *Abood* and *Keller*[2] (which held that objecting teachers and lawyers could not be forced to subsidize the speech of a union or a bar association unless that speech was germane to the organization's purpose), this court affirmed. *Southworth v. Grebe*, 151 F.3d 717 (7th Cir.1998).

The Supreme Court granted certiorari and reversed. *Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). In following the principles set out in *Abood* and *Keller*, the Supreme Court acknowledged that students attending a "university cannot be required to pay subsidies for the speech of other students without some First Amendment protection." *Id.* at 231, 120 S.Ct. 1346. The Court nevertheless held that the means of implementing First Amendment protections adopted in *Abood* and *Keller* were "neither applicable nor workable in the context of extracurricular

---

1. As discussed below, the University no longer uses student referenda to fund RSOs. *See infra* at 570.

2. *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v.* *State Bar of California,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990).

student speech at a university." *Id.* at 230, 120 S.Ct. 1346. However, the Supreme Court held that "[t]he University must provide some protection to its students' First Amendment interests.... The proper measure, and the principal standard of protection for objecting students ... is the requirement of viewpoint neutrality in the allocation of funding support." *Id.* at 233, 120 S.Ct. 1346.

Because in its earlier appeal the plaintiffs stipulated that the ASM Finance Committee and the SSFC allocated the student activity fees in a viewpoint-neutral fashion, the question of viewpoint neutrality was not before the Supreme Court. But, as the Supreme Court noted, the plaintiffs' stipulation did not extend to the referendum method of funding student activities, under which "by majority vote of the student body a given RSO may be funded or defunded." *Id.* at 235, 120 S.Ct. 1346. This is problematic, the Court explained, because "[t]he whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Id.* While noting that the record was sparse on the referendum feature, the Court concluded that "[t]he student referendum aspect of the program for funding speech and expressive activities, however, appears to be inconsistent with the viewpoint-neutrality requirement." *Id.* at 230, 120 S.Ct. 1346. Accordingly, the Court concluded that "[a] remand is necessary and appropriate to resolve this point; and the case in all events must be reexamined in light of the principles we have discussed." *Id.* at 236, 120 S.Ct. 1346.

Following remand, the plaintiffs moved for leave to void their stipulation that the ASM Finance Committee and the SSFC made funding decisions in a viewpoint-neutral fashion. *Southworth,* 2000 WL 831585 at *3. The plaintiffs explained that they had made this stipulation because they

believed that under *Abood* and *Keller,* the University could not force them to fund others' speech, whether or not the funds were distributed in a viewpoint-neutral manner. *Id.* at *3. The plaintiffs also requested leave to amend their complaint to allege that the mandatory fee system was not viewpoint-neutral because it granted the student government unbridled discretion for deciding which groups to fund. *Id.* We concluded that those issues were best left to the discretion of the district court. *Id.* at *4. Accordingly, we remanded to the district court, directing it to consider the plaintiffs' motion for leave to amend their complaint and to void their stipulation that the funds were distributed in a viewpoint-neutral manner. *Id.* We also remanded to the district court for further consideration of the constitutionality of the referendum. *Id.* at *3.

Back before the district court, the University moved to dismiss the constitutional challenge to the referendum method of funding student groups. The University maintained that the plaintiffs' challenge to the referendum was moot because, following the Supreme Court's decision in *Southworth,* the University had amended its student activity fee policy, eliminating the referendum method of funding student organizations. The parties later stipulated to the dismissal of the students' claim challenging the constitutionality of the referendum. The district court then considered the plaintiffs' motion to void their stipulation of viewpoint neutrality and for leave to amend their complaint. The plaintiffs also sought leave to add Benjamin Thompson as a plaintiff. The district court granted all three motions, adding the additional student-plaintiff, voiding the stipulation of viewpoint neutrality, and allowing the plaintiffs to amend their complaint. A bench trial then proceeded on the plaintiffs' amended complaint.

Following trial, the district court issued an oral ruling, holding that the University's mandatory fee system violated the plaintiffs' First Amendment rights by granting the student government too much discretion for determining which student organizations to fund. Four days later, on December 11, 2000, the district court issued a written Supplemental Decision and Order further explaining its oral ruling. *Fry*, 132 F.Supp.2d 744. Specifically, the district court explained that "[s]ome degree of discretion may be both necessary and constitutionally permissible in the segregated fee program." *Id.* at 749. But the court went on to note that the student government's "discretion not limited by express objective standards is insufficient to adequately safeguard the principle of viewpoint neutrality." *Id.* However, the district court deferred entry of its judgment for two months to allow the University time to modify the fee system. *Id.* at 750.

The University and student government then adopted changes to their fee distribution policies; these changes attempted to limit the student government's discretion and assure viewpoint neutrality. The amended policies were presented to the district court in mid-February. After reviewing the changes, the district court ruled that despite the modifications "[t]he level of the student government's discretion is unchanged." The district court then entered judgment in the plaintiffs' favor and enjoined the University from "compelling plaintiffs to pay those portion of the mandatory fees which funded expressive activities of RSOs to which the students objected." The University appeals.

## II.

On appeal, the University first argues that the district court abused its discretion in allowing the plaintiffs to void their stipulation of viewpoint neutrality. The University also contends that the plaintiffs lack standing to challenge the viewpoint neutrality of the fee system, and that in any event a facial challenge is inappropriate. Next, the University maintains that the constitutional prohibition against granting governmental authorities unbridled discretion does not apply in the context of a student activity fee system. Alternatively, the University argues that even if the unbridled discretion standard applies, the district court erred in concluding that the University's fee system granted the student government such discretion.

### A. Stipulation of Viewpoint Neutrality

 Following remand from the Supreme Court, we remanded this case to the district court to consider the plaintiffs' request to void their stipulation that "[t]he process for reviewing and approving allocations for funding is administered in a viewpoint-neutral fashion." *Southworth*, 2000 WL 831585 at *4. "A stipulation is binding unless relief from the stipulation is necessary to prevent a 'manifest injustice' or the stipulation was entered into through inadvertence or based on an erroneous view of the facts or law." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1206 (7th Cir.1989). "As with other matters of trial management, the district court has 'broad discretion' to decide whether to hold a party to its stipulation; the district court's decision will be overturned on appeal only where the court has clearly and unmistakably abused its discretion." *Id.* at 1206.

In this case, the district court concluded that voiding the stipulation was appropriate because "[p]rior to the Supreme Court's decision in *Southworth*, lower courts analyzed this compelled speech question using the 'germaneness' analysis in *Abood* and *Keller*." Thus, as the dis-

trict court recognized, the plaintiffs' stipulation took on "a new significance after the Supreme Court's decision in *Southworth....* " The district court further noted that "[a]t the time plaintiffs entered into the stipulation they could not have foreseen that they were stipulating to a conclusion that would eventually be dispositive of the case." The district court then reasoned that "[u]nder the circumstances, it is apparent that the stipulation was entered into through inadvertence and a mistake of law. Were the Court to conclude otherwise it could be envisioned that parties would refrain from entering into stipulations for fear of inadvertently stipulating away their case on appeal."

This court's earlier decision also followed the compelled-speech cases of *Abood* and *Keller, Southworth,* 151 F.3d at 732, rather than the viewpoint-neutrality analysis subsequently adopted by the Supreme Court in *Southworth,* 529 U.S. at 233, 120 S.Ct. 1346. In voiding the plaintiffs' stipulation, the district court properly considered this development. Moreover, in the final analysis the University is not harmed by the district court's decision to void the plaintiffs' stipulation because that stipulation, at most, bound only the named plaintiffs.[3] Had the district court refused to void the plaintiffs' stipulation, other University of Wisconsin–Madison students (such as Benjamin Thompson, who was added as a plaintiff only upon remand) could have immediately filed a new lawsuit against the University. That would likely result in repetitive filings, motions and discovery. Under these circumstances and given the district court's fully reasoned explanation, we conclude that the district court did not abuse its discretion in allowing the plaintiffs to void their stipulation.

The limited case law in this circuit analyzing a district court's decision to void a stipulation supports this conclusion. In *Cates v. Morgan Portable Building Corp.,* 780 F.2d 683 (7th Cir.1985), we held that the district court was acting within its broad discretion in voiding the parties' stipulation that on remand the case would be tried based on the record of a previous trial. *Id.* at 690–91. In that case, "[i]t turned out that the record of the previous trial did not fully illuminate the issue of mitigation of damages, which became a focus of concern in the case only after [the appellate court] reversed the second judgment." *Id.* at 690. Similarly, in this case, the issue of viewpoint neutrality did not become a focus of concern until the Supreme Court rejected this court's reliance on the compelled-speech cases of *Abood* and *Keller.*

This court also considered the propriety of voiding a stipulation in *Graefenhain,* 870 F.2d 1198 (7th Cir.1989). In that case, the plaintiff stipulated that the court, rather than the jury, could decide the issue of damages in his age discrimination case. *Id.* at 1205. However, after it became apparent that the damages trial would involve a much more complex factual issue concerning whether or not the plaintiff would have been terminated in a RIF, the plaintiff moved to void his stipulation and to try the question of damages to the jury. *Id.* at 1206. The district court refused to void the stipulation. *Id.*

*Graefenhain* is factually distinguishable from this case because in that case there was "no indication that [the plaintiff] mis-

---

**3.** On appeal, the plaintiffs contend that their "stipulation only applies to the system in place at the time of the first District Court decision in November 1996. The stipulation does not extend to the altered systems now before the Court." Because we conclude that the district court did not abuse its discretion in voiding the stipulation, we need not decide whether the stipulation was so limited.

understood the law of damages for wrongful discharge...." *Id.* Conversely, here, the plaintiffs (as well as the district court and this court), applied a line of case law that the Supreme Court rejected. Also, in *Graefenhain,* while we affirmed the district court's refusal to void the stipulation, we also noted that the changed circumstances "may have empowered the district court to exercise its discretion to void the prior agreement...." *Id.* But we concluded that "the court's failure to do so was not an abuse of discretion." *Id.* at 1206. Changed circumstances which alter the focus of a case or the importance of an issue may justify the voiding of a stipulation. Had the district court in *Graefenhain* voided the stipulation, that too would likely not have been an abuse of discretion. *See United States v. Williams,* 81 F.3d 1434, 1437 (7th Cir.1996) ("It is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the *appellate court to affirm both.* That possibility is implicit in the concept of a discretionary judgment."). As explained above, see *supra* at 572, the district court acted within its broad discretion. Therefore, we affirm the district court's decision voiding the plaintiffs' stipulation of viewpoint neutrality.

## B. Standing

■ The University next argues that the plaintiffs lack standing to challenge the mandatory student activity fee system. "[P]arties seeking to invoke the jurisdiction of federal courts must show that they have standing to sue within the meaning of Article III." *Krislov v. Rednour,* 226 F.3d 851, 857 (7th Cir.2000). Essentially, this requires that the plaintiff "have suffered an 'injury in fact,' defined as 'an invasion of a legally protected interest which is ... concrete and particularized and 'actual or imminent'....'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130,

119 L.Ed.2d 351 (1992) (internal citations omitted). There must also be a causal connection between the injury and the conduct, and the injury must be redressable by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130.

■ In this case, the plaintiffs' alleged concrete and particularized interest is an assurance that their mandatory student activity fees are distributed in a viewpoint-neutral manner. The Supreme Court's decision in *Southworth* makes clear that this is a legally protected interest. As the Court explained, "[i]t infringes on the speech and beliefs of the individual to be required, by this mandatory student activity fee program, to pay subsidies for the objectionable speech of others without any recognition of the State's corresponding duty to him or her." *Southworth,* 529 U.S. at 231, 120 S.Ct. 1346. Accordingly, as the Court held, "the objecting students may insist upon certain safeguards with respect to the expressive activities which they are required to support," *id.* at 229, 120 S.Ct. 1346, and "[t]he University must provide some protection to its students' First Amendment interests...." *Id.* at 233, 120 S.Ct. 1346. As the Court explained, the proper measure of that protection "is the requirement of viewpoint neutrality in the allocation of funding support." *Id.* This language makes clear that the students have a First Amendment interest in assuring that the University administers the mandatory fee system in manner ensuring viewpoint neutrality. In fact, the University admits as much, acknowledging in its brief on appeal that the plaintiffs have an "independent First Amendment right not to be compelled to support non-governmental speech with which they disagree, where the system for distributing funding discriminates against other student groups ... on the basis of viewpoint." This inde-

pendent First Amendment right satisfies the injury-in-fact requirement of standing.

Nonetheless, the University argues that the plaintiffs lack standing because the plaintiffs do not claim "that the University has engaged in specific acts of viewpoint discrimination." The plaintiffs respond that since they are not presenting an as-applied challenge, but rather a facial challenge to the unbridled discretion the University grants the student government for deciding which RSOs to fund, they need not allege any actual incidents of viewpoint discrimination to have standing. In support of their argument, the plaintiffs cite several licensing and permit cases, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), wherein the Supreme Court held that a licensing scheme vesting the decisionmaker with unbridled discretion violates the First Amendment and may be challenged facially, without the necessity of applying for and being denied a license. The University counters that the constitutional principles established in licensing and permit cases are inapplicable to a mandatory fee system and therefore the plaintiffs not only lack standing, but also cannot present a facial challenge to the system, and that in any event the unbridled discretion standard on which the plaintiffs rely does not apply outside the sphere of licensing and permit schemes.[4]

At this juncture, this case has seemingly jumped from one issue—that of viewpoint neutrality—to another—the question of unbridled discretion. Before proceeding, it is necessary to put the parties' contentions into context. The plaintiffs do not contend that the University actually engaged in incidents of viewpoint discrimination, but instead claim that the mandatory fee system fails to satisfy the *constitutional mandate of viewpoint neutrality* because it grants the student government *unbridled discretion*. From the plaintiffs' perspective, the prohibition on unbridled discretion is *part of* the viewpoint-neutrality requirement. Thus, under the plaintiffs' theory, a granting of unbridled discretion by the University to the student government constitutes a violation of the requirement of viewpoint neutrality. Because the plaintiffs do not claim actual incidents of viewpoint discrimination, but rather a violation of the unbridled discretion component of the viewpoint-neutrality requirement, on appeal the plaintiffs focus solely on the question of unbridled discretion. This explains the shift from the viewpoint-neutrality language to the unbridled discretion jargon.

Conversely, the University maintains that the only constitutional requirement for the mandatory fee system is that it actually operate in a viewpoint-neutral manner. The University does not see the unbridled discretion prohibition as a component of viewpoint neutrality, but rather as a separate constitutional standard, and

---

4. In condemning overly broad grants of discretion to governmental officials, the Supreme Court has used various language to describe the constitutional deficiency, including "unbridled discretion," *see Forsyth County*, 505 U.S. at 133, 112 S.Ct. 2395; *Lakewood*, 486 U.S. at 755, 108 S.Ct. 2138, "unfettered discretion"; *see Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 154, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), "unduly broad discretion," *see Thomas*, 534 U.S. at 323, 122 S.Ct. at 780, and "overly broad discretion," *see Forsyth County*, 505 U.S. at 129, 112 S.Ct. 2395; *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). For consistency and simplicity, in discussing this constitutional principle in general, we refer to it as the "unbridled discretion standard."

one which applies only in the context of licensing and permit cases.

### 1. Unbridled discretion and viewpoint neutrality.

■ To determine whether the unbridled discretion standard is a component of viewpoint neutrality, we turn to several Supreme Court cases for guidance, beginning with *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In *Freedman,* the Supreme Court considered the constitutionality of a state law requiring movies to be approved by a Board of Censors before being shown anywhere in the state. The Board had the authority to reject films considered "obscene" or that "tend[ed] in the judgment of the Board, to debase or corrupt morals or incite to crimes," terms that were broadly defined by the statute. *Id.* at 52, n. 2, 85 S.Ct. 734. Rather than applying for a license from the Board, Ronald Freedman exhibited an unlicenced film at his theater and then challenged the constitutionality of the licensing scheme. *Id.* at 52–53, 85 S.Ct. 734. The Court in *Freedman* held that the state law constituted a prior restraint on speech and established a censorship system, and thus was constitutional only if it satisfied certain procedural safeguards. Specifically, the Court held that given the grave dangers of a censorship system, to avoid constituting an invalid prior restraint

(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*Thomas,* 534 U.S. at 321, 122 S.Ct. at 779 (quoting *FW/PBS, Inc. v. City of Dallas,*

493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), and summarizing the *Freedman* standard). Because the Maryland licensing scheme lacked these procedural safeguards, the Supreme Court held that the motion picture censorship statute violated the First Amendment.

While *Freedman* focused on the procedural requirements for a prior restraint and censorship system, as opposed to the unbridled discretion standard, it is important to begin with *Freedman* because later unbridled discretion cases rely heavily on *Freedman's* standing analysis. This is because the Court in *Freedman* began its discussion by noting that

[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it *delegates overly broad licensing discretion* to an administrative office whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.

*Id.* at 56, 85 S.Ct. 734 (emphasis added). The Court further explained that standing in such cases was appropriate "because of the danger of sweeping and improper application in the area of First Amendment freedoms." *Id.* This language, while very general, acknowledges the constitutional infirmity of overly broad licensing discretion, and provides for standing to facially challenge such discretion.

More directly discussing the question of unbridled discretion is the Supreme Court's decision in *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). In *Shuttlesworth,* the appellant challenged the constitutionality of a city ordinance making it an offense to participate in a parade, procession or other public demonstration without first obtaining a permit from the city commissioner. *Id.* at 149, 89 S.Ct. 935. The

ordinance granted the commissioner absolute power to deny a permit to protect "public welfare, peace, safety, health, decency, good order, morals or convenience." *Id.* at 149, 89 S.Ct. 935. The Court began its analysis by reiterating its consistent condemnation of " 'licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.' " *Id.* at 153, 89 S.Ct. 935 (quoting *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (citing *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)); *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951)). The Court then concluded that the city's ordinance, as written, was unconstitutional because it conferred upon the city commission "virtually unbridled and absolute power to prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways." *Id.* at 150, 89 S.Ct. 935.

The evolution of the unbridled discretion standard continued with the Supreme Court's decision in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (4–3 decision). In that case, the City of Lakewood passed an ordinance authorizing the mayor to issue applications for annual permits for the installation of newsracks on public property. *Id.* at 753, 108 S.Ct. 2138. While authorizing the mayor to grant or deny applications for annual newsrack permits, the ordinance did not specify any criteria to guide the mayor's decision. *Id.* at 753, 108 S.Ct. 2138. If the mayor denied the permit, he was only required to "stat[e] the reasons for such denial." *Id.* But even if the mayor approved the application, in issuing the permit the city could subject the annual permit to several terms and conditions, including any "terms and conditions deemed necessary and reasonable by the Mayor."

*Id.* at 753–54, 108 S.Ct. 2138. Rather than applying for the permit, a newspaper publisher sued the city, alleging that the ordinance at issue violated the First Amendment. *Id.* at 754, 108 S.Ct. 2138.

In *Lakewood*, the Supreme Court first considered whether the newspaper had standing to present a facial challenge to the ordinance since it had never applied for a permit. Relying on *Freedman*, the Court noted that its "cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Id.* at 755–56, 108 S.Ct. 2138. The Court then explained the rationale for allowing a facial challenge to a statute allegedly vesting unbridled discretion in a government official, noting two identifiable risks to free expression— the risk of self-censorship and the risk that the licensing official, not limited by express standards, will use his power to suppress speech. *Id.* at 757–58, 108 S.Ct. 2138. As to the risk of self-censorship, the Supreme Court explained:

> [T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.... Self-censorship is immune to an "as applied" challenge, for it derives from the individual's own actions, not an abuse of government power.... Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship.

*Id.* at 757–58, 108 S.Ct. 2138 (internal citation omitted).

The Court also expounded more fully on the second risk:

> Second, the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guides *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.... In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of "as applied" challenges render the licensor's action in large measure effectively unreviewable.

*Id.* at 758–59, 108 S.Ct. 2138.

After summarizing the rationale underlying the unbridled discretion standard, the Court in *Lakewood* held that the ordinance violated the First Amendment by not imposing the necessary standards to limit the mayor's discretion: "It is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion. Indeed, nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id.* at 769, 108 S.Ct. 2138.

While *Lakewood* was a 4–3 decision, the Supreme Court applied the same standing analysis and unbridled discretion standard in *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), a case involving a parade-permit ordinance. In *Forsyth County,* the county passed an ordinance requiring a permit for any parade, assembly or demonstration, and requiring every permit applicant to "pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air public meeting shall take place." *Id.* at 126, 112 S.Ct. 2395 (internal citation omitted). However, the ordinance also allowed the county administrator "to adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Id.* at 127, 112 S.Ct. 2395 (internal citation omitted). An organization called the Nationalist Movement applied for a permit to hold a rally. The county imposed a $100 fee for issuance of the permit based on 10 hours of the county administrator's time. "The fee did not include any calculation for expenses incurred by law enforcement authorities ... [and][t]he county administrator testified that the cost of his time was deliberately undervalued and that he did not charge for the clerical support involved in processing the application." *Id.* at 127, 112 S.Ct. 2395. The Nationalist Movement nonetheless refused to pay the $100 fee, and instead sued the County alleging that the ordinance was facially invalid because it granted the County overly broad discretion for determining the amount of the permit fee.

The Court in *Forsyth* began by stating that a permit system "must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official." *Id.* at 130, 112 S.Ct. 2395. The Court next addressed the issue of standing, explaining "the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner,

but whether there is anything in the ordinance preventing him from doing so." *Id.* at 133 n. 10, 112 S.Ct. 2395. Based on this well-established principle, the Court concluded that the Nationalist Movement had standing to present a facial challenge.

The Court next considered whether the ordinance violated the First Amendment by providing the county officials with unbridled discretion. The Court concluded that it did, explaining:

> Based on the county's implementation and construction of the ordinance, it simply cannot be said that there are any narrowly drawn, reasonable and definite standards, guiding the hand of the Forsyth County administrator. The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official.

*Id.* at 132–33, 112 S.Ct. 2395.

Most recently, in *Thomas,* the Supreme Court applied the unbridled discretion standard to the Chicago Park District's permit scheme. In that case, several political activists brought a facial challenge to the constitutionality of a Chicago ordinance which required individuals to obtain a permit to hold "a public assembly, parade, picnic, or other event involving more than fifty individuals" on Chicago Park District property. 534 U.S. at 318, 122 S.Ct. at 777. One issue before the Court in *Thomas* was whether the procedural safeguards set forth in *Freedman* applied to the Chicago ordinance. *Id.* at 779. *See supra* at 574–75 setting forth the *Freedman* procedural safeguards. The Supreme Court concluded that "*Freedman* is inapposite because the licensing scheme at issue was not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.* The Court nonetheless noted that "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Id.* at 780. Thus, as the Court explained, the ordinance must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* The Court then reviewed the various provisions of the ordinance, and concluded that the ordinance provided reasonably specific and objective standards to limit the discretion of the Park District and to protect against the risk that the Park District would deny a permit based on the content of the speech involved. *Id.* at 780–81. Accordingly, the Court held that the ordinance sufficiently limited the licensing official's discretion so as to satisfy First Amendment concerns. *Id.* at 781.

From this line of cases there is much to be garnered, but we begin with the initial question of whether the unbridled discretion standard is part of the constitutional requirement of viewpoint neutrality. While the Supreme Court has never expressly held that the prohibition on unbridled discretion is an element of viewpoint neutrality, we believe that conclusion inevitably flows from the Court's unbridled discretion cases. From the earliest unbridled discretion cases to *Thomas,* the Supreme Court has made clear that when a deci-

sionmaker has unbridled discretion there are two risks: First, the risk of self-censorship, where the plaintiff may edit his own viewpoint or the content of his speech to avoid governmental censorship; and second, the risk that the decisionmaker will use its unduly broad discretion to favor or disfavor speech based on its viewpoint or content, and that without standards to guide the official's decision an as-applied challenge will be ineffective to ferret out viewpoint discrimination. Both of these risks threaten viewpoint neutrality. *See, e.g., Thomas,* 534 U.S. at 323, 122 S.Ct. at 780 ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech *based on its content.*") (emphasis added); *Lakewood,* 486 U.S. at 763–64, 108 S.Ct. 2138 ("[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based on the . . . *viewpoint* of the speaker.") (emphasis added). Given that the risks which the Supreme Court sought to protect against in adopting the unbridled discretion standard are risks to the constitutional mandate of viewpoint neutrality, we conclude that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement.

The University presents many arguments as to why the unbridled discretion standard does not apply in this case, but as discussed below, these arguments are misplaced. First, the University contends that viewpoint neutrality is the sole constitutional protection afforded the plaintiffs

based on the following language from the Supreme Court's decision in *Southworth:*

> There is symmetry then in our holding here and in *Rosenberger:* Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected. We conclude that the University of Wisconsin may sustain the extracurricular dimensions of its programs by using mandatory student fees with viewpoint neutrality as the operational principle.

*Southworth,* 529 U.S. at 233–34, 120 S.Ct. 1346 (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)).[5]

While this language makes clear that the mandatory fee system must be viewpoint-neutral, contrary to the University's position, the Supreme Court did not hold that that was the only constitutional requirement. Nor did the Court in *Southworth* discuss the exact parameters of the "operational principle of viewpoint neutrality" or whether the constitutional mandate of viewpoint neutrality includes a prohibition on unbridled discretion, which is not surprising given that the Court was merely addressing the issue of compelled speech. In the cases where the Supreme Court has focused on the unbridled discretion standard, it has fully explained the rationale underlying that standard, making clear that the prohibition sought to protect against viewpoint discrimination. And as discussed above, we believe this rationale compels the conclusion that the requirement of viewpoint neutrality includes as a

---

5. In *Rosenberger,* the Supreme Court held that the University of Virginia violated the First Amendment by using student activity fees to fund some student newspapers, while refusing to fund a Christian newspaper based on that newspaper's viewpoint. *Rosenberger,* 515

U.S. at 837, 115 S.Ct. 2510. The Court held that the student activity fees constituted a metaphysical forum and therefore the University could not discriminate based on viewpoint with respect to access to the money. *Id.* at 830, 115 S.Ct. 2510.

580

corollary a prohibition on unbridled discretion.

Moreover, in *Southworth*, in discussing the mandatory fee system as a forum, the Supreme Court expressly stated, "[o]ur public forum cases are instructive here by close analogy." 529 U.S. at 229, 120 S.Ct. 1346. Similarly, in *Rosenberger*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700, the Supreme Court stated that while a mandatory fee system is "a forum more in a metaphysical than in a spatial or geographic sense ... the *same principles* are applicable." *Id.* at 830, 115 S.Ct. 2510 (emphasis added). This language compels the conclusion that the same principles which apply to governmental regulations of parks, sidewalks and streets through permit and licensing schemes also apply to the University's forum of money established by its mandatory fee system. As discussed above, in the context of public forums, the Constitution prohibits the government from providing decisionmakers with unbridled discretion for granting access to the forum. Given, then, the Court's language in *Southworth* and *Rosenberger*, the same principle applies in this case. In fact, given this language, the unbridled discretion standard of permit and licensing cases would apply here to the mandatory fee system whether we viewed it as a component of viewpoint neutrality or as a separate constitutional mandate.

The foregoing language also refutes the University's argument that the constitutional standards set forth in permit and licensing cases involving access to a physical forum, such as a park or city street, do not apply to a metaphysical forum of money, such as a mandatory fee system. But even beyond the Supreme Court's reference in *Southworth* and *Rosenberger* to the "same principles" governing physical public forum cases, the rationale underlying licensing and permit cases supports appli-

cation of the unbridled discretion standard in the case of a metaphysical forum of money. Just as speakers may self-censor their speech to obtain access to a physical forum, so too may students self-censor their activities and speech to avoid being denied access to the forum of money. Moreover, if the student government lacks specific and concrete standards to guide its funding decisions, it could use its unbridled discretion to discriminate on the basis of viewpoint. Yet that viewpoint discrimination would go unnoticed because without standards there is no way of proving that the decision was unconstitutionally motivated. Because the same concerns justifying the unbridled discretion standard in physical forum cases exist in the metaphysical sphere (and because the Supreme Court directed us to the principles set forth in physical forum cases), the unbridled discretion standard appropriately applies to the University's mandatory fee system, whether we consider it a component of viewpoint neutrality or a separate constitutional requirement.

2. *Standing revisited.*

■ Having concluded that the unbridled discretion standard applies to a mandatory fee system, we return to the question of standing, which is now easily resolved. Recall that the University argued that the students lack standing to sue because they fail to allege any actual incidents of viewpoint discrimination. However, as summarized above, *see supra* at 574–78, the Supreme Court has long held that when a licensing scheme vests unbridled discretion in a government official, a plaintiff has standing to facially challenge that regulation without applying for a license. As also detailed above, *see supra* at 578–80, while this case involves a challenge to a mandatory fee system, as opposed to a licensing or permit ordinance, the Constitution none-

theless prohibits a mandatory fee system from granting unbridled discretion to the decisionmaker. A straightforward application of those principles to the case at hand, then, demonstrates that the plaintiffs have standing to facially challenge the mandatory fee system on the grounds that it grants the student government unbridled discretion; just as a plaintiff has standing to present a facial challenge to a licensing statute without applying for a license, see supra at 574–78, so too do these students have standing to present a facial challenge to the University's mandatory fee system without applying for, or being denied, funding. Accordingly, we conclude that the students have standing to challenge the University's alleged failure to conform with the constitutional requirement of viewpoint neutrality by granting unbridled discretion to those making the funding decisions.

## C. Unbridled Discretion

█ The question still remains, however, as to whether the University's mandatory fee system does in fact vest the student government with unbridled discretion. The University contends that it does not, citing to the numerous limits on the student government's discretion for awarding funds to student organizations. The University adopted many of these limitations following the district court's ruling that the policies in place at the time of trial failed to sufficiently restrain the student government's discretion. Because the question of unbridled discretion necessarily turns on the details of these limitations, we begin by setting forth those provisions, including any amended policies, in detail, starting with the various University policies and then discussing the policies adopted by the student government.

### 1. University standards limiting discretion.

The University's Financial and Administrative Policies provide that "[e]xpenditures of [student activity fees] must conform with constitutional requirements, including the decision of the United States Supreme Court in *Board of Regents v. Southworth....*" The University also amended the Financial and Administrative Polices, adding the following provision:

[E]ach student government in consultation with the chancellor, must develop policies and procedures that, at a minimum:

(1) Describe any written criteria, in addition to those elsewhere established by law, for the allocation of [student activity fees];

(2) Require the creation of a detailed record, which may be a tape recording of all student fee funding allocation deliberations;

(3) Require that student organizations denied funding be provided, upon request, with a written statement of reasons for the denial;

(4) Provide a mechanism for avoiding conflicts of interest by students participating in the process for allocation of student fee funding, which mechanism may include requiring that participants disclose lobbying contacts; and

(5) Establish an appeal process within student government for the review of student fee funding decisions, where it is alleged that the decision was based on a student organization's extracurricular speech or expressive activities, resulting in a violation of the requirement that allocable student fees be dis-

tributed in a viewpoint-neutral manner.

The University also added a new provision to the Financial and Administrative Policies allowing for appeals of funding decisions to the Chancellor:

Institutions must provide for an appeal to the Chancellor of a student fee funding decision where it is alleged that the decision was based on a student organization's extracurricular speech or expressive activities, resulting in a violation of the requirement that allocable student fees be allocated in a viewpoint-neutral manner, and where the appealing party has exhausted the process for review of student fee funding decisions established by the student government for such cases. The Chancellor's decision shall be final, unless the matter is brought to the Board of Regents in accordance with Regent Policy Documents 86–4 and 88–6.

Additionally, the University adopted a formal policy detailing the procedures for appealing a funding decision to the Chancellor:

(1) A registered student organization (RSO) or person aggrieved[6] by a student fee funding decision made by the student government acting pursuant to s. 36.09(5), Wis. Stats., may appeal the decision to the chancellor or his or her designee where:

(a) The appeal alleges that the decision was based on an RSO's extracurricular speech or expressive activities, resulting in a violation of the requirement that student fee funding be allocated in a viewpoint-neutral manner; and

(b) The appealing party has exhausted the process for review of student fee funding decisions established by student government for such cases.

(2) Appeals under this policy must be in writing, and state with specificity the basis for the claim that the funding decision was based upon the RSO's speech or expressive activities and resulted in violation of the requirement that student fees be allocated in a viewpoint-neutral manner.

(3) The chancellor shall review the matter, on the record created in accordance with the student governance review process, and shall issue a written decision within 20 days of receipt of the appeal.

(4) The chancellor's decision shall be final, except that, in the event that an irreconcilable difference of judgment develops concerning the allocation of

**6.** The plaintiffs also seem to argue that the appeals process fails to protect their First Amendment interests because the process is available only to RSOs who were denied funding. The plaintiffs correctly note that whether or not they are denied funding, they have a First Amendment interest in the distribution of funds in a viewpoint-neutral basis. *Southworth,* 529 U.S. at 229, 233, 120 S.Ct. 1346. However, the plaintiffs incorrectly assume that the appeals mechanism is not available to them. The Bylaws specifically authorize appeals by an RSO or "person[s] aggrieved by a student fee funding decision." Under *Southworth,* the plaintiffs would constitute "person[s] aggrieved by a student fee funding decision" where that decision is alleged to be viewpoint-based. Moreover, on appeal, the University specifically states that "[t]he appeals procedures adopted after trial were written generally so as to permit any aggrieved student to challenge funding decisions claimed to violate viewpoint neutrality." And during oral argument, the University acknowledged that the appeals process would be available to any student claiming that the funding decision was not viewpoint-neutral. Therefore, we conclude that the appeals process detailed herein is available to the plaintiffs and thus properly considered as an element limiting the student government's discretion.

the segregated fee funds, the matter may be brought to the Board of Regents in accordance with Regent Policy Documents 86–4 and 88–6.

In addition to these University policies, the ASM has in place Bylaws governing the process of allocating student activity fees.[7] Some of the procedures and policies differ depending on whether the RSO's funding is from the GSSF or from the SGAF.[8] We begin by discussing the Bylaw provisions applicable to both funding methods, and then summarize the Bylaw provisions governing an RSO's application to the SSFC for funding from the GSSF, followed by a synopsis of the provisions applicable to SGAF grants.

We begin then with Article Ten of the ASM Bylaws, entitled "Viewpoint Neutrality Compliance." This provision states that the ASM must make all financial decisions in a viewpoint-neutral fashion. The Bylaws also require that all ASM Officers, before entering upon their respective duties, take an oath to support and uphold the Bylaws, which would obviously include the requirement of viewpoint neutrality. But the ASM has gone even farther, requiring every appointee to the ASM Finance Committee and SSFC to take the following oath:

> I solemnly swear or affirm to support the Constitution and Bylaws of the ASM, to make decisions concerning the funding of Student Organizations in a

view-point-neutral fashion as required by law, and the ASM Constitution and Bylaws and to faithfully discharge the duties as a member of the SSFC to the best of my ability.

The Bylaws further provide that they "shall be interpreted to ensure all Viewpoint Neutral Financial decisions are made in a viewpoint-neutral fashion." The Bylaws then state that any action in violation of viewpoint neutrality is null and void and that any ASM officer that violates the principle of viewpoint neutrality is subject to "firing, impeachment or removal from all offices and positions held in the ASM."

The Bylaws also adopt some general procedural requirements applicable to both GSSF grants and SGAF grants. Specifically, the Bylaws require that "[a]ny meeting where a Financial decision occurred must be audio taped. No official financial business may occur at any meeting that was not taped." Additionally, "[a]ll members of an ASM body making a Viewpoint Neutral Financial Decision must use a standardized evaluation form." The ASM must also make available on its website all funding applications and committee decisions, and the ASM must make all other records available within five school days of a written request for such material. This gives students access to

> all documents given to or created by an ASM body making a financial decision

---

7. At this point it is helpful to list again the various acronyms and their organizations. ASM is the Associated Students of Madison, which is the student government of the University of Wisconsin–Madison. An RSO is a Registered Student Organization. The SSFC is a sub-committee of the ASM, namely the Student Services Finance Committee. The SSFC disburses grants from the GSSF, or the General Student Services Fund. Another ASM sub-committee, the ASM Finance Committee, distributes grants from the SGAF, the Student Government Activity Fund.

8. As noted, the GSSF is administered through the SSFC while the SGAF is administered through the ASM Finance Committee. As discussed below, the type of funding sought and the proposed use of that funding determines whether the SSFC or the ASM Finance Committee is responsible for the allocation decision. The approval procedures for each source vary.

[i]ncluding, but not limited to (1) any audio recordings of hearings or meetings required to be made, (2) any applications and attachments to the applications, (3) all evaluation forms used by the ASM body, and (4) any final written decision of the ASM body.

In addition to these procedural requirements, Article Six of the Bylaws establishes an appeals process applicable to both SSFC and ASM Finance Committee decisions. These Bylaw provisions authorize the Student Judiciary to ensure that all financial decisions are made in a viewpoint-neutral manner by providing that "[a]ny decision of a committee may be appealed, as of right to the Student Judiciary by filing a complaint subject to the provisions of this Article." The Bylaws further state that "[t]he affected RSO must file an appeal to a Committee decision within five (5) school days of the notice of the adverse decision. Any other ASM member must file an appeal to a Committee decision within 5 school days of the publication of the decision."

The Bylaws further provide for a Standard of Review for the Student Judiciary, stating that the Student Judiciary "shall determine de novo (i.e., without any deference to the Committee's decision) all Committee decisions . . . ." However, under the Bylaws, the Student Judiciary will defer to the Committee's funding decision if in awarding a grant, the SSFC or ASM Finance Committee compared the applying RSO to other similar RSOs.

The Bylaws also include several procedural safeguards regulating the appeals process. For instance, the Bylaws provide that "all proceedings where witnesses and evidence are presented shall be audio recorded in the same manner as the Committee's hearings were . . . [and that] the Panel shall set a hearing within 5 schools days after the filing of the complaint." The Bylaws require that "the Justices publish a written decision on the case within 5 school days of the complaint hearing." Following a decision by the Student Judiciary, "[a]ny party adversely affected by the decision may file an appeal to the decision of the panel within 5 school days of the publishing of the panel's decision."

While the above provisions apply to grants allocated by both the SSFC and the ASM Finance Committee, other Bylaw provisions establish rules for the differing grants. For example, Part Three, Article Five of the Bylaws sets forth provisions governing GSSF grants issued by the SSFC. Under these guidelines, to obtain funding from the GSSF, an RSO must first apply for "eligibility," and after being declared "eligible" the RSO must apply for funding. To be considered eligible, the student group must be an RSO [9]; it must have been awarded two years of ASM operation grants; it must have written governing documents; it must completely and accurately fill out the eligibility application and adequately answer the questions of the Committee; it must provide a specific and identifiable educational benefit and service to the students of the University; it must have a clear purpose and mission statement; and it must have a clear plan and goals. The RSO must also state "[t]he objectives the organization intends to achieve which must be evaluated affirmatively, negatively, or numerically." Additionally, the RSO must provide an estimate of the logistical support necessary to achieve its objectives, including an accurate estimate of the cost of such logistical support. Moreover, the RSO must demon-

---

9. To qualify as a Registered Student Organization, among other things, a group must be a formalized not-for-profit group, composed mainly, but not necessarily exclusively, of students, controlled and directed by students, and open to all students.

strate that a substantially equivalent service is not being provided elsewhere for the students at the University. Additionally, a representative of the RSO must attend the eligibility hearing. Finally, the RSO cannot violate its own governing documents, the ASM Bylaws and Constitution, UW System Policy, or State and Federal law, and it must not have knowingly, willfully, or intentionally violated the ASM Financial Policies within the last two years.

After an RSO applies for eligibility, the SSFC then holds a public hearing to determine whether the organization is eligible to receive funds from the allocable portion of the student activity fees. Notice of the hearing is posted outside the ASM office and in both student unions. "All decisions by SSFC concerning an RSO's eligibility for funds must be in writing and published within 10 school days of the organization's hearing." Section 3 of the Bylaws also provides that "[a]ny person or RSO may appeal an eligibility or monetary decision on the basis that the decision was not made [in a] viewpoint-neutral manner." An appeal from the eligibility decision is filed with the Student Judiciary, which delivers its decision to the Student Council. The Student Council will then make a final decision on the eligibility of the organization, and that determination may be appealed to the Chancellor of the University.

If an RSO is deemed "eligible" for funding by the SSFC, it must still actually apply for funding: "Any eligible RSO applying for GSSF funding must submit the General Student Service Fund monetary application by September 30th of the fiscal year prior to the RSO's request for funding." The Bylaws provide that all RSOs deemed eligible receive a guaranteed minimum amount of funding, but they also authorize the GSSF to award an RSO additional funding if:

[a]n eligible RSO has demonstrated the ability to effectively expense the funds that the group was awarded in the manner proposed; [a]n eligible RSO has demonstrated that it has accomplished the objectives that it had set out to accomplish in the past; [a]n eligible RSO has demonstrated that the request for funds is reasonable within the objectives it has set; [a]n eligible RSO has demonstrated a need for the request for funding to achieve its objectives; [a]n eligible RSO has demonstrated that it has submitted accurate requests for funding in the past; and [a]n eligible RSO has established that its eligibility criteria have not substantially changed.

The SSFC then holds a public hearing to determine the additional amount, if any, to award the RSO. The Bylaws further require the SSFC to finish the GSSF Budget by October 31, "and the appeals process . . . by November 15."

The ASM Bylaws also allow for appeals from the SSFC funding decision: "Any person or RSO may appeal a . . . monetary decision on the basis that the decision was not made [in a] viewpoint-neutral manner." The appeal is heard by the Student Judiciary pursuant to the procedures detailed above.

The above-described procedures apply to GSSF grants distributed by the SSFC. An RSO may instead seek funding from the ASM Finance Committee. The ASM Finance Committee distributes three different types of grants: operations grants, event grants and travel grants. Part Two, Article Seven of the ASM Bylaws sets forth some very general guidelines for these grants. For example, the Bylaws outline the general application process, and require that the ASM Finance Committee assure that any group receiving a grant is an RSO, that the ASM name, logo and disclaimer is included on

all printed materials paid for by the grant, and that the ASM Finance Committee prepare and maintain the grant applications. The Bylaws also set forth certain types of expenses which cannot be paid for with certain types of grants. For instance, operations grants cannot be used for events, salaries, stipends or wages, and event grants cannot be used to fund travel to conferences or periodic publications. Additionally, the Bylaws require the ASM Finance Committee to withhold a certain percentage—which varies by the type of grant at issue—of funds for the spring semester.

Other than these very general provisions, however, the Bylaws do not provide any specific funding criteria for operations, event or travel grants. Rather, the Bylaws delegate this responsibility to the Finance Committee: "[The] Finance Committee must develop [a] set [of] criteria for making event, operations, and travel grants.... The Finance Committee will outline the criteria in financial rules of procedure." However, in delegating this responsibility to the Finance Committee, the Bylaws do provide that "[t]he criteria that the Finance [C]ommittee adopts must be viewpoint-neutral."

Pursuant to this delegation of authority, the ASM Finance Committee adopted Rules of Procedure governing the distribution of event and operations grants.[10] Specifically, the Finance Committee Rules of Procedure set forth the following criteria for the allocation of event grants:

Section One: Criteria Event Grants

a. All event grant decision[s] must occur in a viewpoint-neutral manner.

b. The following criteria will be used to allocate event grant funds

1. The student group must be a Registered Student Organization

2. The application must be submitted by the appropriate deadline

3. The application must include the following:

 -complete of (sic) application

 -attachment of bio and cost estimates

 -accuracy of estimates and correctly added

 -adequate description of expenses

 -[a]dequate description of event and goals of event

 -[d]etailed publicity/promotion plan

4. The organizers should have sought out cosponsorships or collaborative efforts

5. The applicant(s) that represent the student group must have attended a hearing

6. The student group adequately answered questions of committee

7. That the amounts requested do not exceed state limits

8. That the honoraria requested is in range of similar speakers/performers

9. That the facility for event suits size of intended audience and type of event

10. That the travel expenses are reasonable for type of event

11. That the event does not duplicate an event already held in current semester or proper justification provided to explain need for similar event

12. That the event is open to all students.

---

**10.** The ASM Finance Committee did not adopt any Rules of Procedure governing travel grants, or if it did, it failed to submit them to the district court. The significance of this omission is discussed *infra* at 592–93.

13. That the location is in he (sic) Madison campus area

14. That the supplies requested cannot be donated or provided by other sources

15. That similar event in past was successful and met most of its goals

16. That the event does not duplicate events/programs provided by other University departments or programs

The Amended Finance Committee Rules of Procedure also defined criteria for operation grants:

Section Two: Criteria Operations Grants

a. All event (sic) grant decision[s] must occur in a viewpoint-neutral manner.

b. The following criteria will be used to allocate event (sic) grant funds

1. That the student group be a Registered Student Organization

2. The application must be submitted by the appropriate deadline

3. The application must include the following:

-complete of (sic) application

-accuracy of estimates and correctly added

-adequate description of expenses

-[a]dequate description of student organization and its goals

-[d]etailed publicity/ promotion/ recruitment plan

4. The applicant(s) that represent the student group must have attended at (sic) hearing

5. The student group adequately answered questions of committee

6. That the amounts requested do not exceed state limits

7. The reasonableness of expense requests based on estimates

8. The number of years that the student group has existed

9. That the group is open to all students

10. That the supplies requested cannot b'e donated or provided by other sources

11. That the group pursued many options for office space.

The Finance Committee applies these Rules of Procedure at a hearing on the various grant applications. Following the hearing, the Committee compiles a preliminary recommendation, posts it for the members of the ASM, and attempts to notify the RSO of the preliminary amount it may receive. The Finance Committee then provides the RSOs with the opportunity to appeal the preliminary grant amount. After considering appeals, the Finance Committee makes final recommendations for the grants.

The district court concluded that the above University Policies, ASM Bylaws, and ASM Finance Committee Rules of Procedure (collectively "Funding Standards") failed to adequately limit the discretion of the ASM Finance Committee and the SSFC, and thereby assure viewpoint neutrality. On appeal, the University contends that the district court erred in reaching this conclusion because the above-described Funding Standards substantially limit the student government's discretion for making funding decisions.

We agree with the University. The numerous and specific Funding Standards detailed above greatly limit the discretion of the ASM Finance Committee and the SSFC. First, the University has an expressed policy prohibiting viewpoint discrimination and requiring conformity with the constitutional requirements set forth in *Southworth*. The University seeks to assure compliance with this policy by requir-

ing ASM officials to take an oath that they will abide by the principle of viewpoint neutrality. And, as noted, the Funding Standards provide for the removal of any ASM official who violates this constitutional mandate. As detailed above, the Funding Standards also set forth specific, narrowly drawn and clear criteria to guide the student government in their funding decisions as to GSSF grants and SGAF operations and event grants. (Travel grants are another matter, *see infra* at 592–93.) Together, these Funding Standards greatly limit the student government's discretion.

The Funding Standards further limit the ASM Finance Committee and SSFC's discretion and their ability to use that discretion to discriminate on the basis of viewpoint by adopting detailed procedural requirements for the hearings. For example, the Funding Standards require notice of hearings, and provide for public hearings. These requirements will thwart any attempt at closed-door stealth viewpoint discrimination. The requirement that hearings be recorded also minimizes the ability of the SSFC and the ASM Finance Committee to use their discretion in an improper way by documenting the hearings; the recordings will memorialize the questions posed and the RSO's various responses, and allow for those not present at the hearing to determine whether the student government raised as an issue the content or viewpoint of the RSO, or whether the viewpoint of the RSO influenced the funding decision. The requirement that the student government disclose all funding documents further checks its discretion, as does the University's policy requiring the student government to provide, upon request, a written statement of reasons for the denial of funding.

Additionally, the University adopted specific deadlines for funding decisions, created a very comprehensive appeals process, and established prompt deadlines for the appeals. These deadlines and the appeals process also limit the SSFC and ASM Finance Committee's discretion and prevent the improper consideration of viewpoint: The deadlines assure that the SSFC and ASM Finance Committee will not delay a decision until the RSO decides to self-censor itself, or until the proposed activity is no longer viable; and the appeals process checks the student government's discretion first by serving as a reminder to the student government that their funding decision will be scrutinized, and second by providing a review of that decision to assure viewpoint neutrality. Moreover, one particular aspect of the review process serves as a convincing protection of viewpoint neutrality. In reviewing funding decisions, the appeals procedures require the Student Council to compare the grant amounts the SSFC and the ASM Finance Committee allocated to various RSOs to determine whether similar RSO applications were treated equally. By comparing the funding decisions, the Student Council can determine whether the student government, while purporting to apply the Funding Standards in a viewpoint-neutral way, nonetheless treated similar RSOs with varying viewpoints differently. The Student Council can then rectify any differing treatment on appeal.

Our conclusion that the mandatory fee system does not grant the student government unbridled discretion for determining GSSF grants and SGAF operations and event grants finds support in the many unbridled discretion cases. For example, in *Thomas,* the Supreme Court held that a Chicago ordinance regulating access to Chicago parks did not grant licensing officials unduly broad discretion. The Court held that the ordinance adequately limited the city's discretion because it set forth the

limited circumstances under which the city could deny the permit, such as:

> [W]hen the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit.

534 U.S. at 324, 122 S.Ct. at 780.

In upholding the Chicago ordinance, the Court also relied on the fact that the ordinance included a deadline for processing applications, required the city to explain the reasons for any denial, and provided for an appeal of the decision to the General Superintendent of the Park District. The Supreme Court concluded that "[t]hese grounds are reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.'" *Id.* at 781 (quoting *Forsyth County,* 505 U.S. at 133, 112 S.Ct. 2395).

Similarly, this court rejected an unbridled discretion challenge to Chicago's parade-permit ordinance in *MacDonald v. City of Chicago,* 243 F.3d 1021 (7th Cir. 2001). In that case, we held that the ordinance at issue sufficiently limited the city's discretion because it provided specific factors for the city to consider in determining whether to issue the license, such as: whether the activity would substantially or unnecessarily interfere with traffic; whether there were a sufficient number of peace officers to police and protect participants; and whether the proposed activity would prevent proper fire and police protection, as well as ambulance services. *Id.* at 1024, 1027–28.

Like *Thomas* and *MacDonald,* in this case the University's fee system sets forth specific and detailed standards guiding the student government's discretion. This contrasts sharply with the licensing and permit schemes stricken by the Supreme Court as granting the decisionmaker unbridled discretion. For example, in *Forsyth County,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101, the Court held that the licensing scheme granted the County unbridled discretion where the ordinance not only failed to provide any articulated standards, but also failed to require any explanation for the decision or provide a review process. *Id.* at 133, 112 S.Ct. 2395. Similarly, in *Shuttlesworth,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162, the Court held that a Birmingham ordinance that required the city commission to issue a parade permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused," unconstitutionally vested the commission with unbridled discretion. *Id.* at 149–50, 394 U.S. 147. Likewise, in *Schneider v. State of New Jersey, Town of Irvington,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the Court invalidated a municipal ordinance which allowed the Chief of Police to deny a permit to door-to-door solicitors if he determined the speaker was "not of good character." *Id.* at 158, 164, 60 S.Ct. 146. And in *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958), the Court struck an ordinance allowing a mayor to deny solicitors a permit based on the "character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare of citizens of the City of Baxley." *Id.* at 321, 325, 78 S.Ct. 277. Compared to these cases, which either set no standards or very general standards, here the Funding

Standards are extremely specific and detailed.

The plaintiffs nonetheless contend that the SSFC and ASM Finance Committee have unbridled discretion because some of the criteria are subjective and thus subject to manipulation. For example, the plaintiffs point to the eligibility criteria for GSSF grants and specifically the requirement that an RSO provide an "identifiable educational service to the students of the University." The plaintiffs argue that this standard provides the SSFC with unbridled discretion because the SSFC could engage in viewpoint discrimination by merely concluding that the proposed speech or expressive conduct of a disfavored RSO does not constitute a "service." The plaintiffs also argue that the ASM Bylaw provision requiring the RSO to "demonstrate that a substantially equivalent service is not being provided elsewhere for the students at the University" creates the possibility of viewpoint discrimination. The plaintiffs reason that if the SSFC funds one RSO's speech or expressive conduct, and then another RSO applies for funding to engage in speech on the same topic or type of activity, albeit with a different viewpoint, the SSFC could deny funding to the contrary viewpoint because "a substantially equivalent service" has already been provided. Thus, according to the plaintiffs, "the SSFC will not in practice fund applicants advocating conflicting points of view." The plaintiffs also claim that even if the *eligibility* criteria is sufficiently limited, the criteria for *funding* eligible RSOs provides the SSFC and the ASM Finance Committee unconstitutional unbridled discretion. For instance, the SSFC or the ASM Finance Committee could deny funding based on an RSO's viewpoint, but claim that it did so because the RSO failed to adequately respond to questions posed during the funding hearings.

Of course, even though the Funding Standards prohibit viewpoint discrimination and provide detailed criteria regulating the eligibility and funding decisions, it is always possible that the student government, or select student representatives, could ignore the Funding Standards and manipulate the eligibility and funding criteria to mask their viewpoint discrimination. But this possibility exists in almost every licensing or permit case. For example, in *MacDonald*, 243 F.3d at 1024, the plaintiffs claimed that the parade-permit ordinance unconstitutionally granted the City unbridled discretion because it allowed the City to consider, among other things, whether sufficient police resources would be available for the proposed march or demonstration. *Id.* at 1026. The plaintiffs argued that this criteria was too broad because the City could falsely claim that it lacked sufficient police resources if it had a hostility toward the requesting group's message. *Id.* Notwithstanding that possibility and the flexibility in the governing criteria, we held that the ordinance did not grant the City unbridled discretion. *Id.* at 1028. Likewise, in this case, while the Funding Standards provide some flexibility, the possibility of viewpoint discrimination is greatly reduced by the many other factors, procedural safeguards and appeals process.

Moreover, as the University admitted at oral argument, if the SSFC or the ASM Finance Committee were to treat one RSO's speech and expressive activities as a student service, but conclude that another RSO's speech and expressive conduct did not constitute a student service, that would constitute proof of viewpoint discrimination. Such viewpoint discrimination would support an as-applied challenge by either the RSO that was denied funding or an individual student required to pay the mandatory student fee. Similarly, if the

SSFC or the ASM Finance Committee denied funding to an RSO seeking to engage in speech or other expressive activities because another RSO was already speaking on that topic, albeit from a differing viewpoint, the RSO or a student subject to the mandatory fee could also maintain an as-applied challenge. Or, finally, if one RSO applied for funding following the blueprints of another RSO, i.e., similar organizational structure, similar types of activities, similar goals, and similar budgets, but received a lower amount of funding, either the RSO or any student who paid the mandatory student activity fee could present an as-applied challenge in court.[11] Given that there is an application deadline for funding from the SSFC, the SSFC will be able to consider all funding requests at one time and thus act in a way that treats all viewpoints equally, and if it fails to do so, the appeals process operates as a further protection to rectify the disparity. This may be a bit more problematic for some of the grants funded by the ASM Finance Committee and distributed throughout the year, but any disparate treatment can again be rectified in the appeals process, or if not, in an as-applied legal challenge.

Finally, as to the criteria focusing on whether the RSO adequately responded to questions posed during funding hearings, as the University points out, it is entirely reasonable for the SSFC and the ASM Finance Committee to question the RSOs in order to determine the propriety of their funding requests. For example, during one hearing, the SSFC asked the Campus Crusade for Christ why it needed to rent the Memorial Union auditorium for its meeting, as opposed to using a free lecture hall or classroom. After learning

that the larger hall was necessary because of the size of the organization, the rental was approved. Such questions are entirely appropriate and necessary for the SSFC and the ASM Finance Committee to evaluate the funding requests. Moreover, as noted above, the requirement that hearings be recorded provides an independent basis for determining whether the RSO adequately responded to the questions posed, as well as whether the questions improperly focused on an RSO's viewpoint. And, once again, the appeals process provides another check on this factor.

The plaintiffs also argue that viewpoint neutrality cannot be guaranteed because students lobby members of the student government to fund or defund organizations based on those organizations' viewpoints. While such lobbying may take place, that does not mean that the student government has the systematic ability to engage in viewpoint discrimination. Rather, the ASM Bylaws and University's policies that expressly prohibit viewpoint discrimination, the funding criteria discussed above, as well as the extensive appeals process, all provide assurances that such lobbying will not infiltrate the decision-making or appeals process. Of course, if such lobbying took place, that evidence would be relevant and properly considered by a jury in considering any as-applied challenge.

Next, the plaintiffs claim that under the current system discrimination against religious groups is still possible. In support of this argument, the plaintiffs point to a meeting between University officials and student government representatives in which the University directed the student government to contact it if the representatives had any concerns about funding reli-

---

11. On appeal, the University expresses concern that groups will splinter in order to obtain more funding. Clearly that is a con-

cern that must be addressed, but the University must do so in a way that does not discriminate against viewpoints.

gious speech or activities. Rather than constituting viewpoint discrimination, this consultation actually serves as another check on the student government's discretion because the University can preempt any effort by the SSFC or the ASM Finance Committee to discriminate against an RSO based on the RSO's religious affiliation or viewpoint. After all, University officials guided by their legal counsel are more likely to properly understand the constitutional mandates of the First Amendment, than are undergraduate students who may wrongly believe that the First Amendment requires—as opposed to prohibits—such discrimination. This open-door policy, therefore, actually serves to safeguard the interests of viewpoint neutrality. However, if the University applies this policy in a way that results in actual incidents of discrimination, once more that would justify an as-applied challenge.

*2. Absence of standards for travel grants.*

 While these Funding Standards greatly limited the discretion of the SSFC, and for the most part the ASM Finance Committee, in adopting Rules of Procedure, the ASM Finance Committee did not provide any criteria governing the award of travel grants. Without these guidelines, the other aspects of the Funding Standards cannot fully operate to protect viewpoint neutrality. In the absence of criteria for issuing travel grants, it will be difficult if not impossible for the University's appeals process to determine whether the ASM Finance Committee reached the proper funding conclusion. Similarly, without knowing the standards being applied to travel grants, a federal court would be unable to determine whether the ASM Finance Committee's discretion was exercised to discriminate against groups with unpopular viewpoints. Therefore, without these additional standards, we cannot conclude that the ASM Finance Committee's discretion is properly limited as to the granting of travel grants. Accordingly, we hold that the mandatory fee system unconstitutionally grants the ASM Finance Committee unbridled discretion for awarding travel grants to organizations which engage in speech and expressive activities. Therefore, until such standards are adopted, the University cannot use the mandatory fees of objecting students for such travel grants.

In conclusion, in addition to expressly prohibiting viewpoint discrimination, requiring student officials to attest to their commitment to viewpoint neutrality, and providing for sanctions against student officials who engage in viewpoint discrimination, the Funding Standards provide narrowly drawn, detailed, and specific guidelines directing the SSFC and ASM Finance Committee's funding decisions as to all funding decisions other than travel grants. The SSFC and ASM Finance Committee's discretion is further limited by the procedural rules governing the funding and appeals process. While the Funding Standards grant a certain amount of discretion, that discretion is no greater than necessary to allow the student government to evaluate the funding requests. Accordingly, we conclude that these Funding Standards sufficiently bridled the SSFC and ASM Finance Committee's discretion to satisfy the First Amendment's mandate of viewpoint neutrality and the prohibition on granting decisionmakers unbridled discretion, except as to the funding of travel grants for which the ASM has yet to adopt specific criteria governing the funding decisions.

**D. Impermissible Viewpoint–Based Criteria**

 While we conclude that the University's Funding Standards, as a whole,

substantially limit the discretion of the SSFC and the ASM Finance Committee as to GSSF grants and SGAF operation and event grants, a few of the criteria relied upon by the University are related to the RSO's speech or viewpoint, and thus are improperly considered by the student government. Before discussing the criteria of concern, however, we turn to *Forsyth*, which provides the necessary context for this issue.

In *Forsyth*, the Supreme Court considered the constitutionality of a parade-permit ordinance that assessed a fee on the organization seeking a permit to cover "the cost of necessary and reasonable protection of persons participating in or observing said ... activit[y]." 505 U.S. at 134, 112 S.Ct. 2395. The Court held that consideration of this factor was invalid because it unconstitutionally tied the amount of the fee to the content of the speech: "In order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response." *Id.* at 134, 112 S.Ct. 2395.

This court applied *Forsyth* in *Chicago Acorn v. Metropolitan Pier & Exposition Auth.*, 150 F.3d 695 (7th Cir.1998). In *Chicago Acorn*, a group seeking to distribute leaflets and hold a rally on Navy Pier was denied a fee waiver even though the City had waived the fee for the Democratic Party's National Convention. The City justified its action by explaining that it was not favoring the speech of the Democratic Party, but rather was motivated by purely economical concerns; "its policy is to waive fees for users who will generate large favorable publicity." *Id.* at 699. Applying *Forsyth*, we held that while the City's intent may have been innocent, the

discriminatory effect on speech was too great to be permitted, *id.* at 701, because "a favorable publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large favorable publicity are respectable, popular politicians and respected, well-established political groups; pariahs need not apply." *Id.* at 699. Accordingly, we concluded that in deciding whether to waive the fee, Navy Pier could not consider whether the event would generate positive publicity. *Id.* at 699.

Both *Forsyth* and *Chicago Acorn* illustrate that in determining access to a forum the criteria considered must be unrelated to the content of the speech and must not have the effect of excluding unpopular or minority viewpoints. With this in mind, we return then to the Funding Standards. One of those standards requires an RSO to have received an ASM grant for at least two years in order to qualify for a GSSF grant. Another criteria considers "the number of years that the student group has existed." Moreover, during oral argument, the University indicated that in determining grant amounts, the SSFC and the ASM Finance Committee consider, among other things, the amount the organization received in previous years as a benchmark for current grants. The Finance Committee's Rules of Procedure also seem to take into account past funding decisions by providing as one consideration the success of past similar events. Similarly, in its brief on appeal, the University contends that "a group in existence for ten years would have a reasonable basis for objecting to a funding decision that treated groups with comparable requests more favorably, which had been around a much shorter time."

Consideration of the length of time that an RSO has been in existence and the amount of funding the RSO received in

prior years cannot be said to be unrelated to viewpoint. First, until recently, the University prohibited funding of "[a]ctivities which [were] politically partisan or religious in nature." Thus, organizations espousing partisan political or religious viewpoints are at a funding disadvantage compared to other viewpoints. Second, until recently there were no procedures designed to assure the distribution of funds in a viewpoint-neutral manner. Thus, to the extent that the current funding decisions are based on the length of time an organization has been in existence, or the amount of funding that the RSO received in the past, the current decisions depend in part on viewpoint-based decisions of the past. This is especially true in the context of the funding of WISPIRG, which in the past received its funding from the constitutionally deficient student referendum mechanism. While the University eliminated the funding of WISPIRG through a referendum, by basing current funding on past funding, the elimination of the referendum did little to rectify the constitutional defect of the referendum. In fact, at oral argument the University stated that WISPIRG is actually receiving slightly more in funding now. In other words, viewpoint discrimination from past years has been institutionalized into the current system.

Moreover, consideration of the length of time an organization has been in existence and the amount of funding an organization has received in the past discriminates against less traditional viewpoints. As we said in *Chicago Acorn*, the government "may not discriminate in the terms of access to these facilities in favor of established parties and popular politicians...." *Id.* at 699. This is because the First Amendment prohibits treating speech "in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (internal citation omitted). *See also, Rosenberger* 515 U.S. at 828, 115 S.Ct. 2510 ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). Yet under the current funding system, historically popular viewpoints are at an advantage compared with newer viewpoints. Accordingly, we conclude that the University cannot consider the length of time an RSO has been in existence, nor the amount of past funding the organization has received, in assessing current funding allocations as those criteria are improperly related to the content of the speech.[12]

A similar concern exists to the extent the Funding Standards require or allow the SSFC and the ASM Finance Committee to consider the number of students benefitting from the speech. Because the First Amendment requires "that minority

12. It is arguable that requiring an RSO to have received a grant from the ASM Finance Committee before qualifying for an GSSF grant could be a valid consideration for determining access to a limited public forum. However, in this case because the University's past policies prohibited partisan or religious organizations from qualifying for past grants, such RSOs could not satisfy this prerequisite on an equal basis with RSOs espousing other viewpoints. Were the University to start from scratch and thus even the playing field, we would be faced with a different, and closer question, namely whether the GSSF is a limited public forum constitutionally reserved for certain groups. This would include RSOs which have received ASM Finance Committee grants for two years. We would also question whether a requirement tied to past grants unconstitutionally discriminates against newer viewpoints in favor of established ones. *See, e.g., Chicago Acorn*, 150 F.3d at 699 (holding that a fee policy favoring popular, well-established political groups unconstitutionally discriminates against less popular viewpoints).

views are treated with the same respect as are majority views," *Southworth,* 529 U.S. at 235, 120 S.Ct. 1346, the University cannot use the popularity of the speech as a factor in determining funding. That does not mean that the University can never consider the number of students involved because some variable expenses will legitimately depend on this factor, such as the amount of money needed for refreshments or programs distributed to attendees. Or, as illustrated above, the number of students interested in an event may necessitate the renting of a larger space, and in this circumstance it is legitimate to consider the size of the attending audience. Because the University may in limited circumstances consider the number of students involved or benefitted, such criteria are not facially invalid, but improper consideration of the popularity of the speech may justify an as-applied challenge.

Finally, before closing we note that our discussion in no way should suggest that the other Funding Standards or other aspects of the mandatory student fee system are unrelated to the content of the speech or otherwise facially valid. The plaintiffs challenge the unbridled discretion of those standards, and that is the issue before this court; however, because the University improperly asserts that longevity and past funding awards properly limit the student government's discretion, that too has become an issue on appeal. Other details of the Funding Standards and the application of those standards are not currently at issue.

## III.

In sum, we conclude that the plaintiffs have standing to challenge the constitutionality of the University's fee system because they have paid mandatory student fees, and under the Supreme Court's deci-

sion in *Southworth,* they are entitled to the protection of viewpoint neutrality. The requirement of viewpoint neutrality includes a mandate that a decisionmaker not possess unbridled discretion. While the plaintiffs believe and the district court concluded that the revised fee system grants the University unbridled discretion, we disagree; the numerous criteria set forth above, coupled with the appeals process, are narrowly drawn and reasonable, and thus sufficiently limit the University's discretion so as to satisfy the requirements of the First Amendment, except as to the funding of travel grants, for which the ASM has yet to adopt specific funding criteria. Until the University or the ASM puts into place standards governing travel grants, as it has done for the distribution of operations and event grants, the University cannot use the mandatory student activity fees of objecting students to fund the travel of groups engaged in political, religious or ideological activities or speech. Moreover, while most of the Funding Standards properly limit the student government's discretion, criteria considering the length of time an RSO has existed and the amount of past funding it has received cannot be considered viewpoint-neutral because those criteria are related to the content and viewpoint of the applying RSO, as well as based on a prior system which lacked the constitutional safeguards of viewpoint neutrality. For these and the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART.