**COLLEGIANS FOR A CONSTRUCTIVE TOMORROW–MADISON, Plaintiff,**

**v.**

**The REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, et al., Defendants.**

**Case No. 09–C–0514.**

United States District Court, W.D. Wisconsin.

Oct. 26, 2011.

David J. Hacker, Alliance Defense Fund, Heather Gebelin Hacker, Folsom, CA, Jordan W. Lorence, Alliance Defense Fund, Washington, DC, Krystal Williams-Oby, Madison, WI, Travis C. Barham, Alliance Defense Fund, Columbia, TN, David Andrew Cortman, Alliance Defense Fund, Lawrenceville, GA, for Plaintiff.

Bruce A. Olsen, Wisconsin Department of Justice, Lori Marie Lubinsky, Axley Brynelson, LLP, Madison, WI, for Defendants.

***DECISION AND ORDER***

LYNN ADELMAN District Judge.

The plaintiff, Collegians for a Constructive Tomorrow—Madison ("CFACT"), is a student organization at the University of

Wisconsin–Madison.[1] It alleges that its members have been deprived of their rights under the First Amendment by the university's system for distributing campus student-activity fees.[2] Before me now are the parties' cross-motions for summary judgment, as well as CFACT's two motions to strike certain evidence from the summary-judgment record.

## I. BACKGROUND

### A. General Background

CFACT's claims arise out of a line of cases involving extracurricular student speech at public universities. *See Bd. of Regents of the Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) ("*Southworth*"); *Southworth v. Bd. of Regents of the Univ. of Wis. Sys.,* 307 F.3d 566 (7th Cir.2002) ("*Southworth II*"). Under these cases, a public university may require a student to pay student-activity fees that are used to fund the expressive activities of student organizations only if it allocates the fees on a viewpoint-neutral basis. *Southworth,* 529 U.S. at 221, 120 S.Ct. 1346. In the present case, CFACT alleges that the defendants have violated the viewpoint-neutrality requirement by denying it eligibility for fees from the General Student Services Fund ("GSSF"), which is a form of student-fee funding at UW–Madison, while at the same time granting eligibility to WISPIRG, another student group at UW–Madison that engages in the same types of activities as CFACT but from a different viewpoint. In related claims, CFACT alleges that the criteria for GSSF eligibility and the criteria for obtaining another form of student-fee funding, known as "contract status," are vague and therefore vest decisionmakers with unbridled discretion to determine who will receive these forms of funding. In yet another claim, CFACT argues that the defendants violated the viewpoint-neutrality requirement in awarding contract status to WISPIRG in 2009. To properly analyze CFACT's claims, I must first provide some background on the system for allocating student fees at the university and the powers and responsibilities of the various defendants.[3]

Public universities in Wisconsin are organized under state law as the University of Wisconsin System. *See* Wis. Stat. § 36.03 (2009–10). The primary responsibility for governance of the system is vested in a board of regents (the "Board"). *Id.* § 36.09(1)(a). The Board appoints a president of the system, *id.* § 36.09(1)(e), who administers the system under Board policies and assists the Board in developing system-wide policies, *id.* § 36.09(2)(a). The Board also appoints a chancellor for each university within the system, *id.* § 36.09(1)(e), and each chancellor is responsible for administering Board policies at his or her institution, *id.* § 36.09(3).

1. Although at times in this opinion it will be necessary to refer to the University of Wisconsin–Madison, the reader should keep in mind that the university is not itself a defendant in this case. Rather, the defendants are various individuals responsible for administering the student-fee system being challenged in this suit.

2. CFACT also brings an equal-protection claim, but because that claim overlaps substantially with CFACT's First Amendment claims, I will not separately discuss it.

3. The defendants are: (1) the members of the Board of Regents of the University of Wisconsin System, sued in their official and individual capacities; (2) University of Wisconsin System President Kevin P. Reilly, sued in his official and individual capacities; (3) the (now former) Chancellor of UW–Madison, Carolyn "Biddy" Martin, sued in her individual and official capacities; (4) the Associated Students of Madison ("ASM"), the student government at UW–Madison; and (5) the members of the ASM Student Services Finance Committee ("SSFC"), sued in their official capacities.

The Board sets the tuition and fees charged to the students enrolled at each university. *Id.* § 36.27(1)(a). Since at least the creation of the UW System in 1973, the Board has required students to pay non-instructional "segregated university fees," [4] which are used to fund a variety of student services, programs, and facilities related to the overall educational mission of the system. (Bazzell Decl. [Docket # 93] ¶ 6.) The system-wide policies governing the administration of these fees are stated in University of Wisconsin System Policy F50 ("Policy F50").[5] Policy F50 divides segregated fees into two categories, allocable and non-allocable. The non-allocable fees (which are not relevant to this case) are used to support certain specified services and facilities, such as student unions, health centers, and child-care centers. Policy F50 § I.A.(2). The allocable fees are used to provide "substantial support for campus student activities," Policy F50 § I.A.(1), and are the student fees at issue in this case. Any "officially recognized student organization" at a university within the system is eligible to receive allocable fees. Policy F50 § II.B.(1).

Under Wisconsin law, the student body at each institution plays a major role in deciding how allocable fees are distributed. The Wisconsin Statutes expressly recognize "the students" as active participants in university governance and grant them the right to organize themselves as they see fit and select their representatives for participation in university governance. *See* Wis. Stat. § 36.09(5); *Student Ass'n of Univ. of Wisconsin–Milwaukee v. Baum,* 74 Wis.2d 283, 246 N.W.2d 622 (1976). With regard to allocable funds, the statute provides that "[s]tudents in consultation with the chancellor and subject to the final confirmation of the board shall have the responsibility for the disposition of those student fees which constitute substantial support for campus student activities." Wis. Stat. § 36.09(5).

In accordance with § 36.09(5), Policy F50 states that the students, through their chosen representatives (the student government), allocate the allocable portion of the segregated fees in consultation with the chancellor and subject to the final confirmation of the Board. Policy F50 § I.A.(1). The policy contemplates that the student government will make recommendations to the chancellor regarding fee allocations. If the chancellor does not identify any problems with the students' recommendations, he or she will forward them to the Board for final confirmation. Policy F50 § II.A. If the chancellor identifies any problems, the students and the chancellor must attempt to resolve their differences. Policy F50 § II.A.(6)(e) & n. 1. If they cannot, the matter is referred to the system president and the Board for final resolution. *Id.*

At the University of Wisconsin–Madison, the students have organized themselves in accordance with § 36.09(5) as the Associated Students of Madison ("ASM"), and have promulgated bylaws governing the distribution of allocable fees.[6] The

4. The parties and the documents in the record use the terms "segregated fee" and "segregated university fee" (or "SUF") interchangeably.

5. Policy F50 is attached as Exhibit 1 to plaintiff's amended answer (Docket # 75–1), and is publicly available on the Internet, http://www.wisconsin.edu/fadmin/fppp/fppp50.htm (last viewed Oct. 24, 2011).

6. The bylaws as they existed in 2008 are attached as Exhibit 2 to CFACT's brief in support of its motion for summary judgment. (Docket # 157–2.) The 2009 version of the bylaws is attached as Exhibit 3 to the same brief. (Docket # 157–3.) A current version is available on the Internet, http://www.asm.wisc.edu/asm-constitution-bylaws-dp1.html (last viewed Oct. 24, 2011). The acts that form the basis for this suit occurred between 2008 and the present, and thus different versions of the bylaws could apply to different issues in this case. However, the parties have

bylaws divide the allocable fees into several different categories and create separate procedures for obtaining fees from each category. As noted, the category of fees at issue in the present case are those that constitute the General Student Services Fund ("GSSF"). Contract-status funding is also relevant, but I discuss it separately, below. In general, GSSF funding is used to subsidize student organizations that provide a "direct service" to "the entire student population." ASM Bylaws § 2.032(3)(c)i.[7]

A student organization's first step towards obtaining GSSF funding is to apply for eligibility with the Student Services Finance Committee ("SSFC"), *see* ASM Bylaws § 2.032(3)(a), which is composed of student members. To obtain eligibility, the student organization must meet the written criteria set forth in the ASM Bylaws. ASM Bylaws § 2.032(3)(c)(3). The SSFC generally holds eligibility hearings one academic year in advance, and if eligibility is granted it will last for two academic years. Thus, if an organization applies for and is granted eligibility in 2008, that organization will be eligible for GSSF funding in 2009–10 and 2010–11. However, an organization that is granted GSSF eligibility must submit its specific funding request to the SSFC every year. Thus, if an organization is granted eligibility in 2008 for the following two academic years, it must submit a funding request in 2008 for the 2009–10 academic year and then a separate funding request in 2009 for the 2010–11 academic year.

If the SSFC votes to deny a student organization's application for GSSF eligibility and the organization believes that the denial was caused by viewpoint discrimination, the organization may appeal to the student judiciary, *see* ASM Bylaws § 5.07(3), which is a branch of the ASM. The student organization initiates the appeal to the student judiciary by filing a complaint. ASM Bylaws § 5.04(1). A hearing is held before a panel of three student justices within ten days of the filing of the complaint, and the panel must publish its decision within ten days of the date of the hearing. *Id.* § 5.04(2). If the student organization is not satisfied with the panel's decision, it may appeal to the full judiciary. *Id.* § 5.05. The full judiciary then decides whether to hear the appeal and, if it decides to hear the appeal, issues a decision within ten days of the hearing. *Id.* § 5.06.

If after exhausting its appeal rights within the ASM the student organization still believes that it has been subject to viewpoint discrimination, it may appeal to the chancellor. Policy F50 § II.A.(6)(e); ASM Bylaws § 5.06(3)(e)2a.v (2008). If the chancellor finds that a decision was made on the basis of viewpoint, she communicates her findings to the ASM, and then the ASM will reconsider the student organization's funding request. If the ASM disagrees with the chancellor's finding, it may bring the matter before the system president and the Board in accordance with Policy F50 and related Board policies. Policy F50 § II.A.(6)(e) & n. 1. If the chancellor finds no viewpoint-neutrality violation, her decision is final. *Id.* The affected student organization does not appear to have a right to appeal the chancellor's finding of no discrimination to the system president or the Board.

not identified any dispositive differences among the various versions.

7. Besides GSSF and contract-status funding, student organizations can receive allocable fees through event grants, operations grants, travel grants, and the "Open Fund." (Am. Answer [Docket # 77] ¶ 68.)

**Contract Status**

The procedures described above apply to any request for GSSF funding. However, if a student organization wishes to use segregated fees to pay full-time, non-student professional staff, that organization must seek and obtain "contract status." "Contract status" is a term used in the ASM Bylaws, but it derives from a limitation on using segregated fees that appears in Policy F50. *See* Policy F50 § I.B.(6)(a)8. Policy F50 states in relevant part that segregated fees may be used to pay "[c]osts of contractual services that benefit all students" where the student's chosen representatives (e.g., the ASM) have demonstrated that there is a "substantial need" for such services and that they cannot be provided by the university, and the chancellor agrees that there is a substantial need for the services and that the university cannot provide them and that the need demonstrated by the student representatives warrants procuring the services. *Id.*

The ASM Bylaws specify the procedures that a student organization must use to obtain contract status. ASM Bylaws § 2.032(7). Once again, the initial application is filed with the SSFC. If the SSFC decides to recommend that the organization receive contract status, it forwards its recommendation to the ASM Contract Advisory Committee, which is composed of three "administrators," the SSFC Chair, another SSFC appointee as determined by the Chair, and a third student selected by the SSFC Chair. The Contract Advisory Committee reviews the "substantial need" requirement of Policy F50 and makes a recommendation to the chancellor. The chancellor then reviews the recommendation and decides whether to grant or deny contract status. If the chancellor denies contract status, the student organization may ask that ASM appeal the denial to the Board of Regents on behalf of the organization. ASM Bylaws § 2.032(7)(h).

**B. Background to Specific Funding Decisions**

CFACT has been a student organization at the University of Wisconsin–Madison since 2002. It describes itself as a "non-profit, non-partisan, student-run advocacy group" that "gives students the opportunity to participate in research, advocacy, and development of public policy involving environmentalism and other concerns." (Am. Compl. ¶ 91.) CFACT members believe that "most consumer and environmental problems can best be met and overcome through the power of the free enterprise system and the ingenuity of science and technology." (*Id.*) CFACT was established as an alternative to WISPIRG, another student organization at UW–Madison that focuses on environmental and consumer issues. CFACT describes WISPIRG's viewpoint on these issues as "politically liberal." (Gilles Decl. [Docket # 69] ¶ 8.) In 2002, CFACT applied for and received GSSF funding and contract status. (Nichols Decl. [Docket # 83] ¶¶ 7–8.) In each of the following years until 2009–10, CFACT received either GSSF funding or contract-status funding. (*Id.*) During this time period, WISPIRG also received either GSSF funding or contract-status funding.

In the fall of 2008, however, the SSFC denied CFACT's application for GSSF eligibility for the following academic year for two reasons. First, the SSFC found that CFACT has not turned in a completed eligibility application by the deadline for doing so, and that therefore CFACT did not satisfy the eligibility criterion stating that the student organization must have completed the eligibility application on time. ASM Bylaws § 2.032(3)(c)3–3 (2008). Second, the SSFC found that CFACT did not satisfy the "direct service" component of the eligibility criteria. CFACT appealed the SSFC's decision to

the student judiciary, and a three-judge panel determined that the SSFC's decision was viewpoint neutral. CFACT appealed to the full judiciary, but the full judiciary declined to hear the case. CFACT then appealed to Chancellor Martin pursuant to Policy F50, who reviewed the SSFC's decision and upheld it.[8] Thus, CFACT did not receive GSSF funding during the 2009–10 academic year. WISPIRG, however, received both GSSF funding and contract status that year.

CFACT reapplied for GSSF eligibility in the fall of 2009, and once again the SSFC denied its application. This time, the SSFC concluded that CFACT did not satisfy the eligibility criterion stating that the student organization's "direct service" must be its "primary focus." ASM Bylaws § 2.032(3)(c)v–3 (2009). The SSFC also determined that CFACT was ineligible for GSSF funding because it had intentionally violated an ASM policy by removing chairs from the campus student-activity center. *See* ASM Bylaws § 2.032(3)(c)iv–5 (2009). CFACT appealed the denial of eligibility to the student judiciary. The panel found that the SSFC had misinterpreted the ASM Bylaw regarding intentional violations of ASM policy and overturned that part of the decision. However, the panel found that the part of the SSFC's decision regarding the primary-focus criterion was viewpoint neutral, and it therefore upheld the SSFC's decision to deny eligibility to CFACT. CFACT appealed the panel's decision the full judiciary, but the full judiciary affirmed. For unknown reasons, CFACT did not appeal the denial of eligibility to Chancellor Martin, and thus the student judiciary's decision was the final word on CFACT's 2009 eligibility application. As a result, CFACT did not receive GSSF funding in the 2010–11 academic year.

Because the grant of GSSF eligibility to WISPIRG in 2008 lasted for two academic years, WISPIRG did not need to reapply for eligibility in 2009. However, contract status lasts for only one year, and so WISPIRG renewed its request for contract status with the SSFC in the fall of 2009. Both the SSFC and the Contract Advisory Committee voted to grant the request. Chancellor Martin concurred, and thus WISPIRG was granted contract status for the 2010–11 academic year.

Currently, neither CFACT nor WISPIRG receives either GSSF funding or contract-status funding.

## II. DISCUSSION

■ Before turning to CFACT's specific claims for relief, it is important to identify exactly what constitutes a violation of the First Amendment in the present context. The holding of *Southworth* is that a public university may compel one of its students to pay an activity fee used to fund a program that facilitates extracurricular student speech—speech with which the student may disagree—only if the university does not "prefer some viewpoints to others." *Southworth,* 529 U.S. at 233, 120 S.Ct. 1346. Thus, the principal right at issue in the present case is the right of CFACT's members to not be compelled to pay into a fee system that funds expressive activity if that system is not administered on a viewpoint-neutral basis.

In *Southworth II,* the Seventh Circuit held that the viewpoint-neutrality require-

8. The precise details surrounding the SSFC's denial of CFACT's application and Chancellor Martin's decision to uphold the denial are stated in my decision on plaintiff's motion for preliminary injunction. *See Collegians for A Constructive Tomorrow–Madison v. Regents of the University of Wis. System,* 698 F.Supp.2d 1058, 1063–66 (W.D.Wis.2010). To the extent that those details are relevant to issues in the present case, I will restate them in the discussion section of this opinion.

ment includes a prohibition on the exercise of "unbridled discretion" by those making funding decisions. 307 F.3d at 578–79. "Unbridled discretion" is a phrase that derives from cases discussing the constitutionality of "prior restraints" on speech, such as censorship laws requiring speakers to obtain governmental permission before speaking. *Id.* at 575–578. In such contexts, the ability of the censor to exercised unbridled discretion—that is, to make decisions without being constrained by express standards—leads to two risks that the First Amendment will not tolerate: (1) the risk that individuals seeking permission to speak will be intimidated into censoring their own speech, and (2) the risk that the censor will use its unduly broad discretion to favor or disfavor speech based on viewpoint and then take advantage of the absence of standards to mask its viewpoint discrimination with a post hoc rationalization. *Id.* The upshot of the incorporation of the unbridled-discretion standard into viewpoint neutrality is that a student-fee system will violate the First Amendment if it is not administered pursuant to express standards that constrain the discretion of those who make funding decisions. Thus, CFACT's members have a First Amendment right to insist that the student-fee system at UW–Madison be administered pursuant to express standards.

CFACT seeks injunctive relief to prevent ongoing violations of the viewpoint-neutrality requirement and damages for violations that have occurred in the past. The claims seeking injunctive relief are brought against all defendants in their official capacities pursuant to *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which allows a federal court to enjoin ongoing violations of federal law. *See Williams v. Wisconsin,* 336 F.3d 576, 581 (7th Cir.2003) ("Official-capacity suits against state officials seeking prospective relief are permitted by § 1983, and under *Ex Parte Young,* they are not barred by the Eleventh Amendment" (citations omitted)); *Entm't Software Ass'n v. Blagojevich,* 469 F.3d 641, 645 (7th Cir. 2006) (*Ex Parte Young* allows suits for prospective relief seeking to bring ongoing violations of federal law to a halt). The claims seeking damages are brought pursuant to 42 U.S.C. § 1983 against certain defendants in their individual capacities. Those defendants are Chancellor Martin, System President Reilly, the ASM as an entity, and the members of the Board. CFACT has not sued the student members of the SSFC in their individual capacities or argued that such students are liable for damages.

I start by analyzing CFACT's claims for injunctive relief and then turn to its claims for damages. CFACT also requests declaratory relief, and at the end of the analysis I briefly discuss whether such relief is appropriate in this case.

### A. Claims for Injunctive Relief

CFACT requests injunctive relief to redress two alleged ongoing viewpoint-neutrality violations: (1) the disparate treatment of CFACT and WISPIRG—i.e., granting GSSF funding to WISPIRG but denying such funding to CFACT; and (2) the use of GSSF eligibility criteria and contract-status criteria that grant decision makers unbridled discretion. I address these claims in turn.

#### 1. Disparate treatment of CFACT and WISPIRG

CFACT's primary claim is that so long as WISPIRG receives GSSF funding, so must CFACT. This claim relies heavily on language used by the Seventh Circuit in *Southworth II.* There, the court stated that if the university were to treat two groups that were identical in every respect except for viewpoint differently—funding one but refusing to fund the other—such

disparate treatment "would constitute proof of viewpoint discrimination." 307 F.3d at 590. CFACT argues that it is essentially identical to WISPIRG, and that the only difference between the two groups is that CFACT is a politically conservative organization while WISPIRG is politically liberal. Therefore, argues CFACT, the university is engaging in viewpoint discrimination.

As a remedy for this ongoing viewpoint discrimination, CFACT asks for an injunction granting it the same access to GSSF funding as WISPIRG. However, while this case was pending, the university decided to discontinue its funding of WISPIRG, at least for the 2011–12 school year. *See* Hacker Decl., Ex. 6 [Docket # 161–6] (WISPIRG eligibility evaluation forms for 2011–12, all of which reflect either "nay" votes or abstentions by SSFC members). Thus, as things stand, WISPIRG and CFACT are being treated equally, and therefore there is no ongoing constitutional violation that would justify an injunction under *Ex Parte Young*. If in the future the defendants make funding decisions that result in disparate treatment of CFACT and WISPIRG, the affected students can bring a fresh suit for injunctive relief.[9]

**2. Unbridled discretion**

CFACT contends that the GSSF eligibility criteria and contract-status criteria are unacceptably vague, such that when the relevant decisionmakers apply the criteria they are exercising unbridled discretion. *Southworth II* includes a detailed discussion of the Supreme Court's unbridled-discretion cases and explains how those cases apply in the mandatory student-fee context. 307 F.3d at 575–92. Although I will not repeat that discussion here, two points deserve special emphasis. First, funding criteria are not unconstitutional simply because they vest decisionmakers with *some* discretion and do not completely eliminate any chance that a decisionmaker will ignore or manipulate the funding criteria in an effort to mask viewpoint discrimination. *Id.* at 590. Rather, it is permissible for decisionmakers to have a certain amount of discretion, so long as the discretion "is no greater than necessary to evaluate the funding requests." *Id.* at 592. Second, in considering whether a student-fee system vests decisionmakers with unbridled discretion, it is important to examine the procedural safeguards and the appeals process built into the system to protect against viewpoint discrimination. *Id.* at 590.

These points are particularly relevant to the present case, because CFACTs arguments at times seem to rest on the assumption that funding criteria are unconstitutional if they vest decisionmakers with any discretion whatsoever or are even the least bit imperspicuous. Indeed, CFACT seems to be of the view that funding criteria are unconstitutional unless they could be administered by computer programs rather than human beings. But that is not the law. The First Amendment prohibits the exercise of unbridled discre-

9. At one point in its briefs, CFACT suggests that it is being treated differently than student groups other than WISPIRG. (Br. in Opp. [Docket # 169] at 27–28.) However, this suggestion is not developed into a freestanding claim for injunctive relief. Rather, the suggestion is incorporated into a section of CFACT's brief devoted to a discussion of the disparate treatment of CFACT and WISPIRG in 2008. (*See id.* at 25 (Section heading "B").) Moreover, even if CFACT intended the suggestion to serve as a freestanding claim, the discussion is so perfunctory that I am unable to meaningfully address it. Thus, I do not consider whether the continued funding of the other groups but not CFACT amounts to ongoing viewpoint discrimination.

tion, not the exercise of discretion that has been "bridled" by express standards and procedural safeguards.

Before getting into CFACT's specific complaints about the GSSF and contract-status eligibility criteria, it is worth reviewing some of the procedural safeguards that apply to the university's student-funding decisions. These safeguards are substantially the same as they were when the Seventh Circuit upheld the GSSF criteria in *Southworth II.* First, all members of the ASM who are involved in student funding decisions must swear an oath to make decisions in a viewpoint-neutral fashion, and any violation of this oath is grounds for removal. Second, the students' decisions are governed by written criteria (which, of course, CFACT says are vague, but we'll get to that). Third, the students are required to make their funding decisions at public hearings, and these hearings are audio-recorded. Fourth, the students are required to explain their decisions in writing by completing eligibility forms and outlining their determinations as to whether a student group meets the funding criteria (see, for example, the forms attached as Exhibit 14 to the Amended Complaint [Docket # 75-14]). Fifth, students who think viewpoint discrimination has occurred may file an appeal with the student judiciary, which will review the matter (possibly twice, through a panel and then again en banc) and render a written decision. Sixth, if the complaining students are unsatisfied with the ultimate decision by the ASM (i.e., the end result of the process provided through the SSFC, the student judiciary, and any other ASM body that might consider the matter), they may appeal to the chancellor, who will review the students' decision and render her own written decision on viewpoint neutrality. (And if there is a dispute between the chancellor and the students, the matter may go to the system president and the Board of Regents.) Finally, if at the end of all of this process the complaining students are still unsatisfied, they may bring an as-applied challenge in court pursuant to the First Amendment. *See Southworth II,* 307 F.3d at 590–91.

#### a. GSSF Criteria

CFACT's challenge to the GSSF criteria focuses on three specific parts. CFACT contends that each of these parts is so vague that it vests decisionmakers with unbridled discretion.

#### i. Criteria governing acceptance of late or incomplete eligibility applications

One of the requirements for receiving GSSF eligibility states that groups that have received GSSF funding in the previous academic year must submit "a mid-year and end-of-the-year report on time, unless granted an exemption by SSFC." ASM Bylaws § 2.032(3)(c)(iv)2. These reports appear to be financial statements that explain what the group did with the GSSF funds it received in the previous year. CFACT contends that this requirement vests the SSFC with unbridled discretion because it provides no standards for determining when a group may be granted an exemption.

The defendants respond by pointing out that the standards for granting an exemption are provided by a subsection of the GSSF eligibility criteria that governs late applications, ASM Bylaw § 2.032(3)(b), which provides as follows:

> If a late application is filed, SSFC must decide to accept it within five days. [A student group] must meet all of the following criteria in order for its late application to be accepted:
>
> 1) The organization/program files the late application no later than ten days after the normal eligibility deadline;

2) The organization/program has not had a late application in the previous two years; and

3) The SSFC determines that there are extenuating circumstance [sic] that justify the late application.

CFACT notes that the bylaws do not expressly state that these standards apply to the midyear and end-of-year reports, but it does not dispute that the SSFC's practice is to so apply them. (CFACT Reply Br. [Docket # 182] at 32 n. 16.) Instead, it argues that these standards are themselves vague because they do not define "extenuating circumstances," and thus they allow SSFC members to exercise discretion in deciding what counts as an extenuating circumstance.

This argument is an example of CFACT's failure to appreciate that, to be constitutionally sufficient, a standard does not have to leave the decisionmaker with absolutely no discretion at all. Rather, a standard is sufficient if it is concrete enough to guide the decisionmaker's discretion and constrain that discretion to the point where the decisionmaker cannot easily manipulate the standard to mask viewpoint discrimination. And the phrase "extenuating circumstances" is concrete enough to do those things. It means "circumstances that tend to diminish culpability," *Oxford English Dictionary* (online version, September 2011), and thus if the SSFC decides to grant an exemption it must identify on the record what it is about the group's circumstances that lessens its culpability. If the SSFC decides to deny an exemption, it must explain why the group's circumstances were not extenuating. It is easy enough for a reviewing body (such as the student judiciary, the chancellor, or a court in an as-applied challenge) to determine whether a group's circumstances really were or were not extenuating. Most circumstances, such as a death in a student's family, will be clear-cut. Other circumstances may present closer questions, but again, standards need only "greatly reduce[ ]" the possibility of viewpoint discrimination, *Southworth II,* 307 F.3d at 590, and so the fact that there will be occasional close calls is not grounds for finding that the standards leave decisionmakers with unbridled discretion.

In its briefs, CFACT claims that the SSFC has not applied the "extenuating circumstances" standard evenly to all student groups, but it does not describe any instances in which the SSFC denied an exemption when extenuating circumstances were present or in which the SSFC granted an exemption when extenuating circumstances were absent. CFACT references its own predicament in 2008, when the SSFC denied its request for GSSF eligibility on the ground that it had failed to submit its end-of-year report on time. But in that case, CFACT could not have been granted an exemption even *if* extenuating circumstances were present because it did not turn its report in within ten days of the deadline.[10] *See* ASM Bylaw § 2.032(3)(b)1. Thus, the SSFC never considered whether CFACT's circumstances were extenuating. In any event, for the reasons discussed, the extenuating-circumstances standard does not vest the SSFC with unbridled discretion. To the extent that any student or student group believes that the SSFC has exercised its *limited* discretion unlawfully, that student or student group's remedy is to bring an as-applied challenge to the specific funding decision.

**ii. Definition of "direct service"**

The purpose of GSSF funding is to subsidize student groups that provide a "di-

10. CFACT contends that it did turn in its report by the deadline, but that is a different issue than whether it should have been granted an exemption.

rect service" to the entire student population. The ASM Bylaws define "direct service" as follows:

> Direct service shall mean any program offered by the group which possesses all of the following characteristics, which the group must clearly and convincingly demonstrate:
>
> 1) The program can be available upon request by recipients
>
> 2) The program can be tailored subject to the needs of the recipients within the mission of the group
>
> 3) The program must be accessible to the recipients regardless of recipient's participation and/or membership in the group
>
> 4) The program must be available to recipients continually throughout the course of the fiscal year
>
> 5) The program is not an individual event, series of events, publication, or a leadership development opportunity for group members.
>
> 6) University students must be the principal beneficiaries of the group's programming

ASM Bylaws § 2.032(3)(c)(ii)(C). CFACT alleges that two parts of this definition are so vague that they allow decisionmakers to exercise unbridled discretion: (1) the requirement that the program be "accessible to the recipients regardless of recipient's participation and/or membership in the group"; and (2) the phrase "series of events" in the fifth part of the definition. However, these parts of the definition are clear. The first part means that the group's service must be available to the entire student body, rather than just the subset of students who choose to join or participate in the group. The second part means that things like a lecture series or a series of movie screenings are not direct services.[11] Again, although there may be marginal cases in which applying these terms proves to be difficult, those do not render the standards themselves unconstitutional.[12]

### iii. Requirement that a direct service be the group's "primary focus"

If a student group is able to show that the service it provides meets the definition of "direct service," it must also show that that service is the group's "primary focus." ASM Bylaws § 2.032(3)(c)(v)3. "Primary" and "focus" are both defined in the ASM Bylaws. "Primary" means "a simple majority (50% + 1)," § 2.032(3)(c)(ii)(I) (2011), and "focus" is defined in terms of the amount of time the group spends planning, coordinating and implementing the direct service, § 2.032(3)(c)(ii)(F) (2011). Thus, a direct service is the primary focus of a group when that group spends more than 50% of its time on the service.

CFACT contends that "primary focus" is unconstitutionally vague, but really its complaint about this term isn't that it is vague (it is not), but that SSFC members have taken different approaches to determining whether a group's direct service is

11. CFACT argues that the exclusion of a series of events from GSSF funding results in discrimination against small groups with unpopular viewpoints that do not have the manpower to provide a continuous service. However, GSSF funding is not the only kind of student-fee funding available to student groups. Other forms of funding, such as "event grants," can be used to fund expressive activities that constitute "events" but not "direct services." Thus, small groups that cannot provide services can still receive funding for their events.

12. CFACT points out that, at their depositions, various defendants gave different definitions of "participation and/or membership" in a group as well as "series of events." (Br. in Opp. [Docket # 169] at 44–46.) However, although it is true that the defendants did not use identical words when asked by CFACT's counsel to define these terms, their answers had very similar, if not identical, meanings.

its primary focus. CFACT notes that some SSFC members just accept what a group writes on its eligibility application about the time spent on a service, while others investigate more closely by asking the group questions during the public hearing. However, there is nothing wrong with the fact that different members take different approaches. Each member must satisfy him or herself that he or she has enough information to render a decision on eligibility.[13] If the same member appears to be applying different approaches to different groups and has no viewpoint-neutral reason for doing so, then that might be grounds for an affected student group to bring an as-applied challenge. But the criterion itself is clear and therefore is not invalid on the ground that it vests decision-makers with unbridled discretion.

#### iv. Conclusion as to GSSF eligibility criteria

Because all the challenged parts of the GSSF eligibility criteria are clear, CFACT's request for injunctive relief is denied. Defendants' motion for summary judgment on this claim will be granted.

### b. Contract Status Criteria

Policy F50 states in relevant part that segregated fees may be used to pay "[c]osts of contractual services that benefit all students" where the student government has demonstrated that there is a "substantial need" for such services and that they cannot be provided by the university, and the chancellor agrees that there is a substantial need for the services and that the university cannot provide them and that the need demonstrated by the student government warrants procuring the services. *See* Policy F50 § I.B.(6)(a)8.[14] CFACT contends that Policy F50 is so vague that it vests decision-makers with unbridled discretion to determine which student groups are entitled to receive contract status. In particular, CFACT contends that Policy F50 does not sufficiently define "substantial need" or what it means for a service to "benefit all students." [15]

**13.** As the Seventh Circuit recognized in *Southworth II,* "it is entirely reasonable for the SSFC ... to question [student groups] in order to determine the propriety of their funding requests." 307 F.3d at 591.

**14.** The text of the relevant part of Policy F50 is as follows:

> Except as limited elsewhere by law or policy, allocable SUF may be used to provide support for campus student activities, including:
>
> ....
>
> (8) Costs of contractual services that benefit all students where: 21
>
> i. The [student government] has demonstrated that there is a substantial need for such services and that they cannot be provided by the UW institution, and has agreed to allocate SUF for this purpose;
>
> ii. The chancellor agrees that there is a substantial need for the services, that the institution cannot provide them and that the extraordinary need demonstrated by the [student government] warrants procuring the services; and
>
> iii. The contractual services are secured pursuant to required state procurement processes.
>
> In no event shall this subparagraph be construed to require a UW institution to provide a particular service.

**15.** I should note that CFACT also challenges the ASM Bylaws that implement the contract-status language in Policy F50. However, the bylaws simply incorporate the language from Policy F50, and so Policy F50 and the bylaws stand or fall together. For simplicity's sake, I will discuss only Policy F50.

I should also note that defendants contend that CFACT has not sufficiently pleaded its challenge to the contract-status criteria. However, while it is true that CFACT does not specifically plead a cause of action alleging that the contract-status criteria must be enjoined because they are unconstitutional, it does plead a general challenge to the validity of the criteria for obtaining segregated university fees. (Am. Compl. [Docket # 75] ¶ 253.) Moreover, CFACT identifies contract-status funding as a form of segregated-university-fee

The parties assume that contract-status funding is used to fund expressive activity by students, and that therefore it is subject to *Southworth's* viewpoint-neutrality requirement and *Southworth II's* prohibition on the exercise of unbridled discretion. However, it seems to me that contract status, as defined in Policy F50, is not meant to serve as a source of funding for expressive activity. Rather, it is meant to serve as a source of funding for a student group that needs to hire professionals to assist it in providing a service to the student body. An example might be a student-run legal clinic. The clinic assists students with simple legal issues that students are likely to face (such as landlord-tenant disputes), and uses contract-status funding to pay the salary of a staff attorney. Student services of this sort do not seem to involve the kinds of expressive activities identified in the *Southworth* cases. *See Southworth,* 529 U.S. at 223–23, 120 S.Ct. 1346 (explaining that the student-fee system under review funded "advocacy and debate" on diverse points of view and enabled "political activity"). However, since the parties seem to agree that contract status has been used to fund expressive activity, I will assume that the requirements of *Southworth* and *Southworth II* apply.

The parties do not give examples of the kinds of groups that currently receive contract-status funding or describe the kinds of services they provide. In fact, as far as the record reveals, no group currently holds contract status. In the past, both CFACT and WISPIRG have received contract-status funding, but it is not clear what "services that benefit all students" they provided with the funding. From some of the documents in the record, it appears that they used contract-status funding to hire professional lobbyists, but it is not clear how the students could have a "substantial need" for the services of professional lobbyists or how such services could have "benefit[ted] all students." Indeed, in recent years, the ASM and the chancellor have disagreed on whether WISPIRG meets the criteria for contract-status funding. *See* Docket # 195 (October 29, 2010 letter from Chancellor Martin to ASM Chair expressing concerns over ASM's application of contract-status criteria); Docket # 157–20 (letter from Chancellor Wiley to WISPIRG explaining that WISPIRG does not meet criteria for obtaining contract status).

CFACT contends that the confusion over whether WISPIRG satisfies the criteria for obtaining contract status shows that the criteria are vague. I disagree. Although the contract-status criteria in Policy F50 are not a model of clear draftsmanship,[16] they nonetheless constitute express standards and do not leave the decision of whether to grant contract status to the whims of SSFC members or other decisionmakers. The criteria provide that a group may be granted contract status only if (1) the group will use contract-status funding to provide a service that benefits all university students, (2) the university cannot or will not provide that service through funding sources other than student-activity fees, and (3) the student government believes that there is a substantial need for the service and the chancellor agrees with the students' assessment of

funding. (*Id.* ¶ 87–90.) This is enough to satisfy Federal Rule of Civil Procedure 8(a).

16. For example, Policy F50 states that contract status can be granted only when there is a "substantial" need for the group's services, but then it goes on to describe the need as "extraordinary." It appears that the drafters of Policy F50 understood these terms to be synonyms, but for the sake of clarity the same term should have been used throughout. In any event, CFACT does not base any of its vagueness claims on the use of "substantial" and "extraordinary" interchangeably.

the need. Although there is certainly some play in the joints when it comes to determining whether a need for a service is "substantial" or whether the service "benefits all students," the contract-status process protects against abuses of these looser terms. Specifically, all decisionmakers must explain in writing the reasoning that led them to decide that the group either does or does not deserve contract-status funding, and these decisions are subject to several layers of review. With these procedural safeguards in place, decisionmakers will find it difficult to disguise their viewpoint discrimination by finding that one group's service is substantial while another, similar group's service is insubstantial, or by finding that one group's service will benefit all students while another, similar group's service will benefit only a subset of students. Thus, as-applied challenges will suffice to protect against any actual abuses of the criteria.

Before leaving this issue, however, I note that the evidence in the record indicates that some student decisionmakers have had trouble determining what Policy F50 means by "substantial need" and "benefits all students." This evidence is summarized in CFACT's briefs. (Br. in Supp. [Docket # 157] at 52–54.) Even Chancellor Martin has expressed dissatisfaction with Policy F50. (Martin Dep. [Docket # 127] at 28–30.) However, this confusion arose in the context of WISPIRG's applications for contract status, and WISPIRG seems to have only a marginal case for contract status. It is thus not surprising that the students have had trouble applying the criteria to WISPIRG. And again, the existence of marginal cases does not render the criteria unconstitutional. Indeed, given the wide variety of student groups and the activities they engage in at UW–Madison, it is difficult to conceive of a set of criteria that would yield a clear answer for every possible case. (Certainly CFACT has not suggested ways of making the criteria clearer.) Thus, although there may continue to be confusion over the application of the contract-status criteria to marginal groups like WISPIRG or CFACT, this does not render the criteria invalid in their entirety. *See Thomas v. Chicago Park Dist.*, 227 F.3d 921, 924 (7th Cir.2000) (courts should be reluctant to strike down a set of criteria on its face on the ground that it is vague or uncertain, even in the First Amendment context).

**B. Claims for Damages**

█ Both *Southworth* and *Southworth II* involved claims for injunctive relief, and so in neither case was the court asked to determine what a plaintiff must demonstrate in order to hold an individual or entity (i.e., a "person" within the meaning of § 1983) liable for damages. In general, however, to establish a § 1983 violation against a governmental official, the plaintiff must show that the official, through his or her own individual actions, has violated the Constitution. *Ashcroft v. Iqbal,* 556 U.S. 662, 675–77, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009); *T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir.2010).[17] An official cannot be found liable for damages on the basis of respondeat superior or other forms of vicarious liability. *Id.*

As discussed, in the student-fee context, a violation of the First Amendment occurs when a public university compels a student to fund speech with which he or she disagrees through a system that is not viewpoint neutral. Thus, a claim for damages

17. *Iqbal* involved an action for damages against federal officials pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, because *Bivens* is the federal analog to § 1983, *Iqbal's* reasoning applies with equal force to § 1983. *See id.* at 1948.

would lie against the members of the Board of Regents if they were to charge a student-activity fee and then allocate the fee through a system that does not include protections against viewpoint discrimination. In this scenario, the Board's policies would violate the holdings of *Southworth* and *Southworth II,* and thus the Board members' creation and maintenance of those policies would satisfy § 1983's personal-involvement requirement.

In the present case, however, the Board's policy is one of viewpoint neutrality: if any student or other decisionmaker makes a funding decision on the basis of viewpoint, that decisionmaker would be violating the Board's policies. Moreover, as discussed in *Southworth II* and elsewhere in the present opinion, the system for distributing student fees at UW–Madison contains sufficient procedural safeguards for preventing viewpoint discrimination. Thus, the members of the Board have complied with *Southworth* and have not been personally involved in any conduct that violates the Constitution.

CFACT contends that because the Board is ultimately responsible for the student-fee system, the Board members are individually liable for any viewpoint-neutrality violations committed by decisionmakers within the system. CFACT is mistaken. If an individual *violated* the Board's viewpoint-neutrality policy when making a funding decision, that individual's discrimination could not be attributed to the Board unless § 1983 permitted vicarious liability. As discussed, however, vicarious liability is not allowed under § 1983, *Iqbal,* 129 S.Ct. at 1948–49, and therefore no individual Board member can be held liable for damages on the basis of an act of viewpoint discrimination committed by other governmental officials. Thus, CFACT's claims for damages against the Board members will be dismissed. (The same rationale applies to the system president, and so the claims for damages against him will also be dismissed.)

It is best to examine the liability of the remaining defendants in the context of CFACT's specific claims. CFACT seeks damages on behalf of its members to redress three acts of viewpoint discrimination: (1) denying CFACT's application for GSSF eligibility for 2009–10, (2) denying CFACT's application for GSSF eligibility for 2010–11, and (3) granting contract-status funding to WISPIRG in 2009.[18] (CFACT also seeks damages for the use of vague GSSF and contract-status criteria, but since I have already determined that those criteria are not vague in the context of CFACT's request for injunctive relief, I do not separately discuss them here.)

The decision to deny CFACT's application for GSSF eligibility for 2009–10 was made by the members of the SSFC. I assume without deciding that if these members made their decision on the basis of viewpoint and no reviewing authority within the UW System (such as the student judiciary, chancellor or Board of Regents) corrected their decision before fees were allocated—meaning that the members' discrimination was the "but for" cause of the denial of fees—then such members would be liable for damages. However, in the present case, CFACT has chosen not to sue the members of the SSFC in their individual capacities (Pl.'s Br. in Opp. [Docket # 169] at 12 n. 4), and therefore they have waived any right to recover damages for the constitutional violations that they may have caused. This leaves only the ASM and Chancellor Martin as defendants who could be liable for damages in connection with this claim.

18. CFACT's members have standing to challenge the grant of contract-status funding to WISPIRG because any student that pays into the student-fee system has an interest in the viewpoint neutrality of all funding decisions. *See Southworth II,* 307 F.3d at 582 n. 6.

CFACT never expressly states that it is seeking damages from ASM as an entity, and thus it is possible that CFACT joined ASM to this suit only to ensure that any injunctive relief would bind all participants in the student-fee allocation process. In any event, assuming that the ASM is an entity that can sue and be sued and that it is a "person" within the meaning of § 1983, the ASM as a whole could not be held liable for the individual acts of viewpoint discrimination committed by SSFC members. ASM's official policy, like the Board's, is one of viewpoint neutrality. ASM even requires its members to swear an oath promising to uphold viewpoint neutrality. ASM Bylaws § 1.11(1). Thus, to the extent that SSFC members took viewpoint into account when voting to deny CFACT's application for GSSF eligibility, they would have been acting against ASM's policy, and so ASM as an entity could not have been personally involved in the constitutional violation in the sense required by § 1983. Holding it liable for the SSFC members' alleged discrimination would thus be a form of vicarious liability, which is forbidden.[19]

This leaves Chancellor Martin, to whom CFACT appealed after the SSFC voted to deny CFACT's application for GSSF eligibility and the student judiciary denied CFACT's intermediate appeals. CFACT argued that the SSFC's determination that it did not meet the "direct service" requirements was a form of viewpoint discrimination, and it separately argued that the SSFC's determination that CFACT did not turn in a completed eligibility application on time was a violation of "due process" and constituted "clerical negligence." *See* Docket # 75–19 (letter from CFACT to Martin). In her written decision, Martin noted that under Policy F50 and the ASM Bylaws, she could upset the students' decision only if it was the product of viewpoint discrimination. *See* Docket # 75–19 (chancellor's decision on CFACT appeal). She then found that CFACT's claim challenging the SSFC's decision concerning the incomplete eligibility application did not have a viewpoint-neutrality component, and that therefore she could not upset the SSFC's finding that the application was incomplete. Finally, she determined that because the SSFC's finding regarding the application was a sufficient basis for the denial of GSSF funding, there was no need to separately consider whether the SSFC's decision concerning CFACT's direct service involved viewpoint discrimination. She therefore denied CFACT's appeal.

CFACT argues that Martin's denial of the appeal is a form of personal involvement that renders her liable for damages. However, under § 1983, a governmental official is liable only for his or her own "misconduct." *Iqbal,* 129 S.Ct. at 1949. Although Martin had some personal involvement in the ultimate denial of funding to CFACT, CFACT does not argue that her involvement included unconstitutional misconduct. That is, CFACT does not contend that Martin's decision was itself based on her distaste for CFACT's viewpoint (or preference for WISPIRG's), that she knew that certain SSFC members had engaged in viewpoint discrimination but decided to turn a blind eye to their discrimination, or that she was deliberately indifferent to a substantial risk that viewpoint discrimination had occurred. Rather, the worst that CFACT attributes to Martin is a failure to detect and correct viewpoint discrimination that may have been committed by SSFC members. Such

19. The rule against vicarious liability under § 1983 applies to private entities acting under color of state law as well as to individuals and municipal corporations. *See Rodriguez v. Plymouth Ambulance Serv.,* 577 F.3d 816, 822 (7th Cir.2009).

a failure is not itself a violation of the rights articulated in *Southworth* and *Southworth II*, and it does not amount to personal involvement in the constitutional violations allegedly committed by the SSFC members. Accordingly, Chancellor Martin is not liable for any damages that CFACT may have incurred as a result of the denial of GSSF funding for 2009–10.[20]

The above analysis also applies to the SSFC's decision to deny GSSF funding to CFACT for 2010–11. Assuming that the SSFC members would be liable for damages if they made their decisions on the basis of viewpoint, they have not been sued in their individual capacities, and no other defendant could be held vicariously liable for their misconduct. Moreover, CFACT did not appeal the 2010–11 decision to Chancellor Martin, and so even if the mere denial of an appeal could satisfy § 1983's personal-involvement requirement, Martin could not be deemed to have been personally involved in the 2010–11 funding decision.

The remaining claim for damages involves the decision to grant contract status to WISPIRG in 2009. This claim rests entirely on the deposition testimony of Matthew Manes, an SSFC member who also served on the ASM Contract Advisory Committee. Manes testified that he took WISPIRG's viewpoint into account when deciding whether to vote in favor of granting it contract status.[21] (Manes Dep. [Docket # 126] at 50:6 to 52:21.) Again, I assume that if Manes's viewpoint discrimination was a "but for" cause of the grant of contract status to WISPIRG, then he would be liable to an injured student for damages. But, as discussed, CFACT has waived its right to recover damages against the student defendants, and an isolated act of viewpoint discrimination cannot be attributed to the other defendants through the use of vicarious liability. Although Chancellor Martin approved the Contract Advisory Committee's recommendation that WISPIRG receive contract status, CFACT does not argue that Martin herself committed viewpoint discrimination or was deliberately indifferent to the risk that the Contract Advisory Committee's recommendation was based on viewpoint.[22]

20. *Iqbal* states that in discrimination cases under the First Amendment, a governmental official cannot be held liable unless he or she acts with discriminatory purpose. 129 S.Ct. at 1948–49. Even if the official knows that others have acted with discriminatory intent and fails to intervene and correct the acts of discrimination, that official is not liable. *Id.* In other contexts, it is enough if the official acts with "deliberate indifference" to whether his or her actions or inactions will result in a constitutional violation. *See Vance v. Rumsfeld,* 653 F.3d 591, 599 (7th Cir.2011). Obviously, a viewpoint-discrimination claim is a discrimination claim under the First Amendment, and so *Iqbal's* requirement of actual discriminatory purpose applies. In any event, CFACT has not argued that Martin acted with discriminatory purpose, deliberate indifference, or any other culpable mental state. To be sure, CFACT alleged in its complaint that Martin acted with deliberate indifference and other culpable mental states (Am. Compl. ¶ 197), but it has not pursued those allegations in its briefs and has instead argued that Martin is strictly liable for the students' alleged discrimination based on the mere fact that she denied CFACT's appeal (*see* Br. in Opp. [Docket # 169] at 18 (no mention of culpable mental states)).

21. Given my conclusion, above, that the contract-status criteria do not enable decisionmakers to disguise their viewpoint discrimination, I should mention that Manes did not attempt to disguise his viewpoint discrimination by manipulating terms in the criteria such as "benefits all students" and "substantial need." Rather, Manes was open about the fact that he was taking viewpoint into account. (*See* Williams Decl., Ex. 8 [Docket # 95–8]; Manes Dep. [Docket # 126] at 49:14 to 52:21.)

22. Again, under *Iqbal,* CFACT would have to show that Martin acted with her own discrim-

Thus, even if Manes committed viewpoint discrimination and his discrimination was a cause of the grant of contract status to WISPIRG, no defendant could be held liable for any injuries that CFACT's members may have sustained as a result of his discrimination.

### C. Claims for Declaratory Relief

The analysis so far has disposed of CFACT's claims for injunctive relief and money damages. However, CFACT has also requested declaratory judgments in connection with most of the claims discussed above. Under 28 U.S.C. § 2201, a district court has discretion to declare the rights of the litigants whether or not further relief is or could be sought. *See, e.g., Medical Assur. Co., Inc. v. Hellman,* 610 F.3d 371, 377–78 (7th Cir.2010). In exercising my discretion, I conclude that this is not an appropriate case for declaratory relief. There are no ongoing violations of federal law, CFACT cannot recover damages for any violations that may have occurred in the past, and I do not see any way in which a declaratory judgment could serve a useful purpose (such as removing a cloud of uncertainty from over the plaintiff's rights). *See Green v. Mansour,* 474 U.S. 64, 73 & n. 2, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (declaratory judgment improper where there is no continuing violation of federal law and damages for past actions are unavailable); *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749 (7th Cir.1987) (declaratory judgment improper where it would serve no useful purpose). Moreover, a federal court must avoid unnecessary constitutional adjudication. *See, e.g., Brandt v. Vill. of Winnetka,* 612 F.3d 647, 650 (7th Cir.2010). It would contravene this policy to adjudicate CFACT's viewpoint-discrimination claims against the SSFC members if the end result would be nothing but a declaratory judgment serving no useful purpose. *See El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 494 (1st Cir.1992) ("declaratory judgments concerning the constitutionality of government conduct will almost always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration of uncharted constitutional terrain").

### D. Motions to Strike

CFACT has filed two motions to strike certain evidence submitted by the defendants in support of their positions on the cross-motions for summary judgment. The grounds for the motions are that the defendants allegedly failed to properly disclose the evidence during discovery. However, I did not consider any of the challenged evidence in the course of deciding the motions for summary judgment, and therefore I will deny the motions to strike as moot.

## III. CONCLUSION

For the reasons stated, the undisputed facts establish that CFACT's claims for injunctive relief, damages, and declaratory relief fail as a matter of law. **THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED** and plaintiff's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's motions to strike are **DENIED.**

inatory purpose; showing that she was deliberately indifferent to the risk that viewpoint discrimination had occurred would not be enough to establish her liability for damages. But CFACT has not attempted to establish either deliberate indifference or discriminatory purpose.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter final judgment.